UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INDUSTRIAL COMMERCIAL | ) | |
| ELECTRICAL, INC. et al., | ) | Case No.:  4:04-cv-40038-WGY |
| | ) | |
| Debtors. | ) | *On appeal from the order of* |
| _____ | ) | *the Bankruptcy Court,* |
| | ) | *Case No. 02-45451-JBR* |
| UNITED STATES OF AMERICA | ) | |
| (INTERNAL REVENUE SERVICE) | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| I.C.E. MANAGEMENT, INC., et al. | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

_____

**APPELLANT'S OPENING BRIEF**
_____

BARRY E. REIFERSON
PETER SKLAREW
Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-6058

*Local Counsel:*

MICHAEL J. SULLIVAN
United States Attorney

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF BASIS FOR APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Statement of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.      THE $450,000 "MANAGEMENT FEE EXPENSE"
        IS NOT AN ALLOWABLE DEDUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      A.     The Court's Finding that the $450,000 "Management Fee Expense"
           Was Merely a Reversal of Unrealized Income Reported for 2002 is
           Clearly Erroneous; the Testimony and Exhibits are Uniform to the Effect
           that the Deduction was a Reversal of Management Fees
           Collected by Management in Prior Years . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      B.     As a Liability for Mismanagement in Prior Years, the "Management Fee
           Expense" Was Not Fixed and Determinable for Purposes of Tax Accrual
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.     The Creation of the $450,000 Liability Exceeded the Examiner's Authority
           (And the Debt was Not Timely Claimed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.     THE TAXPAYER DID NOT INTRODUCE
        CREDIBLE EVIDENCE ON ANY OTHER ISSUE . . . . . . . . . . . . . . . . . . . . . . . 27

      A.     The Committee is Not the Taxpayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      B.     The Taxpayer Was Required to Introduce Credible Evidence on
           All of the Items that Contributed to the claimed NOL,
           and Failed to Do So . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      C.     The Court Erred in Modifying the Statutory Requirement that the Taxpayer
           Introduce Credible Evidence (or Substantiate its Income and Deductions) on
           the Premise that the IRS Had Failed to Identify the Items It Intended to
           Question . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III.    THE TAXPAYER DID NOT SUBSTANTIATE ITS
        LACK OF INCOME AND ITS DEDUCTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

      A.     Management Fees Were Not Accounted For . . . . . . . . . . . . . . . . . . . . . . . . . 36

      **B.**      **Management Failed to Justify Expense Accruals** . . . . . . . . . . . . . . . . . . . . . . . **37**
            **1.** *The Deduction for Officers' Compensation is Suspect* . . . . . . . . . . . . . . . **38**
            **2.** *The Deduction for Depreciation is Also Suspect* . . . . . . . . . . . . . . . . . . . . . **39**

**IV.**     **THE TAXPAYER FAILED TO MAINTAIN ALL REQUIRED RECORDS AND COMPLY WITH REASONABLE REQUESTS FOR INFORMATION** . . . . **40**

**V.**      **THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN DENYING THE IRS A 30-DAY CONTINUANCE AFTER THE PROVISION OF 111 DAYS COMBINED FOR AN IRS EXAMINATION AND DEPARTMENT OF JUSTICE TRIAL PREPARATION** . . . . . . . . . . . . . . . . . . . . **41**

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

# TABLE OF AUTHORITIES

**Cases:**

Brandt v. Repco Printers & Lithographics (In re Healthco Int'l), 132 F.3d 104 (1st Cir. 1997) . . 5

Gold Coast Hotel & Casino v. United States, 158 F.3d 484 (9th Cir. 1997) . . . . . . . . . . . . 26, 27

Helvering v. Horst, 311 U.S. 112 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

In re Indian Motocycle Co., 261 B.R. 800 (1st Cir. BAP 2001) . . . . . . . . . . . . . . . . . . . . . 8, 42

In re Southwestern States Marketing Corp., 179 B.R. 813 (N.D.Tex. 1994),
aff'd 82 F.3d 413 (5th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

McDonald v. Commissioner of Internal Revenue, 114 F.3d 1194, 1997 WL 284819
(9th Cir. May 23, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Meyer v. Commissioner, T.C. Summary Opinion 2003-46. 2003 WL 2002500
(U.S. Tax Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

O'Dwyer v. Commissioner, 266 F.2d 575 (4th Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946) . . . . . . . . . . . . . . . . . . 31

Wilkinson v. Commissioner, 71 T.C. 633 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Statutes:**

11 U.S.C. § 101(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11 U.S.C. § 101(15) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

11 U.S.C. § 101(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

11 U.S.C. § 106(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11 U.S.C. § 502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11 U.S.C. § 503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3, 7, 8, 43

11 U.S.C. § 505(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28

11 U.S.C. § 505(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

11 U.S.C. § 505(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 9, 22, 42, 43, 44

11 U.S.C. § 1102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

11 U.S.C. § 1103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

11 U.S.C. § 1104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 25

11 U.S.C. § 1107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 42

26 C.F.R. § 1.166-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

26 C.F.R. § 1.166-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

26 C.F.R. § 1.461-1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26 C.F.R. § 1.6001-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 41

26 U.S.C. § 166(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

26 U.S.C. § 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17, 29, 35

26 U.S.C. § 461(h)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

26 U.S.C. § 6001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 41

26 U.S.C. § 6411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 6, 9, 24, 34, 41, 43

26 U.S.C. § 7491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 158(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1334(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## APPELLANT'S OPENING BRIEF

The United States of America, Internal Revenue Service ["IRS"], submits this brief in support of its appeal from the bankruptcy court's Order entered on January 28, 2004.[1]

### Introduction

The United States is appealing an order disallowing an administrative claim filed by the IRS under § 503(b)(1)(B)(ii) of the Bankruptcy Code (11 U.S.C.) ["B.C."], which allows the IRS priority recovery of a tentative tax refund made pursuant to § 6411 of the Internal Revenue Code (26 U.S.C.) ["I.R.C."] that is "attributable to an excessive allowance of a tentative carryback adjustment that the estate received" after the petition date, regardless of the tax year affected by the carryback. Section 6411 requires the IRS to issue "tentative" refunds on an expedited basis when taxpayers claim net operating loss carrybacks to generate overpayments in prior years. Because the tax code precludes the IRS from examining the claim, except for computational errors or material omissions, it gives the IRS the right to recoup the refund if a subsequent examination (sometimes called an audit) of the loss-year return later reveals that the refund was excessive. The administrative claim status accorded to such tax debts by B.C. § 503(b)(1)(B)(ii) simply recognizes that the government's claim is in the nature of a right to restitution from the recipient, which is the bankruptcy estate, not the prepetition debtor, when the estate's fiduciary makes the § 6411 application and receives a tentative refund that it was not entitled to.

In these jointly administered bankruptcy cases involving three related debtors, one of them, I.C.E. Management Corporation, Inc., applied for and received a postpetition tentative refund of $347,345. Its § 6411 application was based on an amended income tax return for its fiscal 2002 tax year (ended June 30, 2002), claiming a net operating loss ["NOL"], that it carried back to claim overpayments of tax for fiscal years 1997 through 2001.[2] Upon receiving notice of

---

[1] In bankruptcy cases, individual agencies, as "governmental units," constitute "entities" that may file administrative claims under § 503, and become parties in interest upon objection to a claim. See 11 U.S.C. § 101(15), (27).

[2] All of the tax years discussed in this brief end on June 30. We refer to tax years by the year in which the tax year ends, not by the year in which it begins. It should also be noted that the returns introduced as exhibits generally reflect, in their upper-right corner, a year that is the year

1

a deadline for filing administrative claims, the IRS filed a protective administrative claim to recover the amount, pursuant to § 503(b)(1)(B). The government is appealing the bankruptcy court's Order sustaining the Debtors' objection to that claim.

We acknowledge at the outset that, unfortunately, after the bankruptcy court issued an order greatly reducing the normal three-year statutory time for the IRS to examine the relevant tax return, the agency failed to commence the examination until shortly before trial. After denying the IRS's motion for an additional 30 days, which the IRS argued would also have enabled it to inform the Debtor of the specific items on the tax return that the government would question at trial, the bankruptcy court effectively ruled that, because the taxpayer lacked advance notice of what the government would question, the taxpayer was relieved of meeting the conditions for shifting the burden of proof to the IRS under I.R.C. § 7491. That provision places the burden on the taxpayer unless the taxpayer, among other things, introduces "credible evidence" on each disputed issue at trial, and also substantiates its deductions. The bankruptcy court decision addresses the merits of only one item on the tax return – a $450,000 deduction for "management fee expense" – effectively excusing the taxpayer from having to produce "credible evidence" on any other item, or substantiate its deductions.

While this brief argues that the burden of proof was not properly applied, and also argues secondarily that the bankruptcy court abused its discretion in denying the requested 30-day continuance of the trial, we emphasize that although these procedural issues are cumbersome and thus consume much space in this brief, our contentions with respect to the merits should be viewed as being at the core of this appeal. No matter how the burden of proof is allocated and regardless of whether the IRS should have been granted more time, the record demonstrates affirmatively that the bankruptcy court completely misunderstood the undisputed testimony and documentary evidence regarding the one tax deduction its opinion addresses (the $450,000 "management fee expense"), and thus erred in allowing that deduction. And, with respect to the

_____

in which the tax year began (since taxpayers with fiscal years that end in the middle of the year generally must use the previous year's tax form since the next year's is not yet available). The forms state elsewhere the end-date of the fiscal year to which they pertain.

items disputed by the government at trial, but not mentioned in the bankruptcy court's decision, the problem is not merely lack of substantiation. In fact, various items on the tax return are affirmatively undermined by the limited evidence introduced by the Official Committee of Unsecured Creditors ["Creditors Committee"] in prosecuting the objection to the administrative tax claim. We submit that, whatever blame may be cast on the IRS for not completing an examination, the record reveals that the refund claim in this case was not remotely justified, and denying recoupment to the IRS would only serve to punish taxpayers at large while granting a $347,000 windfall to other creditors waiting in line for a distribution from the bankruptcy liquidation.

### STATEMENT OF BASIS FOR APPELLATE JURISDICTION

Debtor I.C.E. Management Corporation, Inc. ["Management"] filed for Chapter 11 protection on September 6, 2002 and its bankruptcy case was ordered jointly administered with those of Industrial Commercial Electrical, Inc. ["ICE"], and I.C.E.-Conn, Inc. (R.001, 067.)[3] The bankruptcy court has jurisdiction over the jointly administered bankruptcy cases pursuant to 28 U.S.C. § 157 and § 1334(a). On June 10, 2003, the bankruptcy court set a bar date of July 8, 2003 for the filing of administrative claims. (R.134-135.) The IRS filed, on or about June 18, 2003, an administrative claim under B.C. § 503(b)(1)(B)(ii) in the amount of $347,345.56, to recover a tentative tax refund applied for and paid to Management, post-petition, pursuant to I.R.C. § 6411. (R.136-137.) The Debtors objected to the administrative claim, (R.154-155), thereby commencing a contested matter under Fed.R.Bankr.P. 9014, a core proceeding over which the bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)(2)(B). Sovereign immunity was waived under B.C. § 505(a)(1) by B.C. § 106(a)(1).

The Debtors moved for an expedited determination of their objection, asking for an order requiring the IRS to complete an examination in 30 days (R.162-166), and the bankruptcy court held a hearing on that motion on July 31, 2003. During that hearing, the Debtors' counsel stated

---

[3] Record citations are to the bates page numbers of the repaginated record supplied to the bankruptcy court clerk for transmission to this Court.

that the matter, though brought by the Debtors, was "really not the Debtors' fight," (R.171), and counsel for the Creditors Committee and counsel for creditor Flagship Bank were heard on the matter.[4]  They requested that the IRS be given 60 days for examination, and that an evidentiary hearing be scheduled for 30 days after that.  (R.172.)  The IRS requested 90 days for examination.[5]  (R.173.)  The bankruptcy court set an evidentiary hearing for November 19, 2003, thereby giving the United States 111 days combined for an IRS administrative examination and trial preparation by the Department of Justice, including discovery.  (R.179.)

The bankruptcy court held an evidentiary hearing and the Debtors failed to appear.  The objection to the administrative claim was prosecuted by the Creditors Committee.  (R.403.)  (See footnote 3 *supra* regarding its standing.)  On January 28, 2004, the bankruptcy court entered an Order sustaining the Debtor's objection to the IRS's administrative claim.  (R.419.)

The United States filed a timely notice of appeal on February 9, 2004 (R.420-421.)  This Court has jurisdiction to hear the United States' appeal pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the bankruptcy court erred by failing to recognize that the reversal of a claimed $450,000 deduction for management fee expense on Management's tax returns was not the reversal of an unpaid management fee charged by Management to ICE for the tax year ended June 30, 2002, as found by the bankruptcy court, but rather the deduction of a belatedly asserted

---

[4] The objection was ultimately prosecuted by the Creditors Committee, whose members (the prepetition unsecured creditors) appear to have no stake in the outcome because the fully liquidated bankruptcy estates are administratively insolvent – *i.e.*, administrative claims exceed remaining funds.  But counsel for Creditor's Committee appears to have had standing to prosecute the tax claim objection in his own right, since recoupment by the IRS will reduce the amount left to pay professional compensation claims under Bankruptcy Code § 330.  The bank also appears to have a stake in the outcome, since it asserts a security interest in all the Debtors' assets, including tax refunds.  The United States maintains that if the Debtor was not entitled to the tax refund, the IRS is entitled to avoid the bank's lien under one of various legal theories that are not material to this appeal.  After the preliminary hearing, the bank and Creditors Committee apparently reached some agreement that Creditors Committee counsel would prosecute the claim objection, since the bank's attorney did not participate in the trial.

[5] If the IRS had completed an examination and determined not to assert a claim, the matter would be moot.  As noted below, § 505(b) normally gives the IRS 60 days to determine whether to conduct an audit that may result in an administrative claim, and 120 days thereafter to complete such an examination, before there can be any adjudication.

liability to repay management fees paid to Management by ICE in tax years prior to the tax year ended June 30, 2002.

2.  Whether the bankruptcy court erred in concluding that Management offered credible evidence in support of other items on the loss-year return that contributed to the net claimed operating loss then carried back to earlier years, including the lack of income, the deducted reversed management fees, and other deductions and expenses.

3.  Whether the bankruptcy court erred in shifting the burden of proof to the IRS without addressing whether Management complied with the requirements of the Internal Revenue Code to substantiate its deductions which resulted in a claimed net operating loss carryback from the tax year ended June 30, 2002.

4.  Whether the bankruptcy court erred in shifting the burden of proof to the IRS without addressing whether the Debtors maintained all records required under the Internal Revenue Code and cooperated with reasonable requests for information and documents.

5.  Whether the bankruptcy court abused its discretion in denying the IRS's request for a 30-day continuance of the evidentiary hearing.

**STANDARD OF REVIEW**

The bankruptcy court's findings of fact may be set aside only if clearly erroneous, whereas conclusions of law are reviewed *de novo*.  Brandt v. Repco Printers & Lithographics (In re Healthco Int'l), 132 F.3d 104, 107 (1st Cir. 1997); Fed.R.Bankr.P. 8013.  The bankruptcy court's finding of fact with respect to the nature of the $450,000 deduction from Management's taxable income for management fee expense (the only item addressed by the bankruptcy court) may be set aside if clearly erroneous, while its conclusions of law should be reviewed *de novo*.

**STATEMENT OF THE CASE**

The Statement of the Proceedings that precedes the Statement of Facts below is perhaps more comprehensive than in the typical appeal.  That is necessary in light of  issue 5 – the government's argument that the bankruptcy court abused its discretion in not granting the IRS an additional 30 days to complete an examination of the loss-year return after it failed to commence

5

an audit until shortly before the hearing.  Also, the same procedural history bears on the burden of proof issues.

### Statement of the Proceedings

Debtor I.C.E. Management ("Management") filed for Chapter 11 protection on September 6, 2002 and its bankruptcy case was ordered jointly administered with those of Industrial Commercial Electrical, Inc ["ICE"] and I.C.E.-Conn, Inc. ("ICE-Conn.") (R.001, 067.) Flagship Bank & Trust Company asserted a secured claim against ICE's bankruptcy estate in the amount of $1,919,902. (R.045.)  On September 11, 2002, the court, upon motion of Flagship Bank & Trust Company for the appointment of a Chapter 11 Trustee, appointed a bankruptcy examiner, pursuant to B.C. § 1104, with powers agreed to by Flagship Bank & Trust.  (R.070.) In picking Stephen Wentzell, a Certified Public Accountant, to be the examiner, the U.S. Trustee consulted with attorneys for the Debtor, the bank, and the Committee.  (R.072.)

Management's federal income tax return (Form 1120) for its tax year ended June 30, 2002, was due September 16, 2002, and appears to have been timely filed with the IRS on that date.[6]  The original return reported zero income and total deductions of $610,135, and hence an NOL (net operating loss) in that same amount.[7]  On or soon after December 17, 2002, Management filed with the IRS an amended income tax return (Form 1120X) for the year ended June 30, 2002, adding another $450,000 in deductions, and thus increasing the claimed NOL to $1,060,135.  (R.329.)

The amended return was accompanied by an application for tentative refund (Form 1139) under 26 U.S.C. § 6411 on the grounds that the $1,060,135 NOL was being carried back, pursuant to I.R.C. § 172, to Management's tax years ended June 30, 1997 through 2001.  (R.343-

---

[6] This is indirectly reflected on line 2b of Management's subsequent application for a tentative refund. (R.343.)  The original 2002 return for the year ended 6/30/2002 is not in the record. (*See* footnote 15 *infra*, explaining the source of the bankruptcy court's mistaken statement that it was among the trial exhibits.)  The government asked Debtors and the Committee to produce the original return shortly before trial, but they indicated that it was in the custody of the Debtors' prior accountant, Mr. Frye, who then said that he did not have any records.  (R.239, 400 n.11.)

[7] Again, the original Form 1120 is not in the record but lines 1, 2, and 3 of Form 1120X (the amended return) represent that the original return was as described in the text above.  (R.329.)

344; 225; 404.)  Based on the application, the IRS remitted to Management a tentative refund of $347,345.56 on or about May 22, 2003.  (R.253, 404.)

There is no indication in the record that either the original or amended return were accompanied by a request for an expedited examination under B.C. § 505(b).[8]  That provision allows a trustee (which includes a debtor in possession under B.C. § 1107) to require the IRS to determine within 60 days whether to audit a tax return and to complete any such examination within another 120 days (unless the court allows additional time).

On April 18, 2003, the bankruptcy court approved a sale of "substantially all" of the Debtors' assets.  (R.024 (DI# 283).)

On June 10, 2003, less than twenty days after the IRS remitted the $347,345.56 tentative refund to the Debtor, the bankruptcy court, at the request of the Debtors, with the assent of the Committee of Unsecured Creditors, established July 8, 2003, as a bar date for the filing of administrative claims.  (R.133.)  On June 18, 2003, the IRS filed its administrative claim under 11 U.S.C. § 503(b)(1)(B) for the payment of the post-petition tentative refund, pending the opportunity for the IRS to conduct a thorough examination of the claimed NOL carryback.  (R.157.)  As the court found, the claim was sent to the Debtors with an explanation that it was "protective" and that if no changes were ultimately proposed to the tax return, the IRS "will amend this proof of claim to $0.00."  (R.156, 405.)

On July 8, 2003, the Official Committee of Unsecured Creditors filed with the bankruptcy court a motion (R.147-53) to approve a stipulation (R.138-146) of settlement among the Committee, Debtors, and creditor Flagship Bank, by which those parties agreed upon the value of Flagship's secured claim (R.141), and conditioned the settlement of their dispute upon a withdrawal or disallowance of the IRS's recently-filed administrative claim by no later than August 30, 2003.  (R.143.)  Curiously, despite this condition and reference to the already-filed tax claim, neither the stipulation nor the motion to approve it were served on the IRS.  (R.146, 153.)  Nor did Committee counsel serve the notice of the hearing, required by Bankruptcy Rule

---

[8] So far as counsel for the United States are aware, there in fact was no § 505(b) request.

2002(a)(3), on the IRS.[9]  The bankruptcy court approved the settlement on July 31, 2003. (R.167.)

The day after the 3-way stipulation was filed, Debtors objected to the United States' administrative claim, and simultaneously moved for an expedited determination. (R.154-166; 403).  The specific relief requested by Debtors was that the IRS have 30 days to audit the loss-year tax return and respond to the objection.  (R.163.)  A hearing was held on July 31, 2003. (R.168-178.)  Debtors' counsel stated that the administrative tax claim, though objected to by the Debtors, is "really not the debtors' fight." (R.171.)  The Creditors Committee counsel and counsel for Flagship Bank requested that the bankruptcy court allow the IRS sixty days for examination – 30 more days than requested by Debtors – but added a request that the Court set an evidentiary hearing for thirty days after that.  (R.172.)

The IRS, through Department of Justice counsel, explained that even 90 days for an audit would be "a very short time frame" to examine the Debtors' tax returns.  (R.172-73.)  He explained that the IRS did not yet have any information whatsoever to back up its claim, after which the bankruptcy court was rather critical, suggesting that the IRS was not adhering to rules applicable to other creditors, that claims be verified "under penalties of perjury."[10]  (R.173-75.) When government counsel answered the court's question as to whether the IRS typically just grants tentative refunds without really questioning them, the Court stated "I wouldn't spread the

---

[9] This is reflected in DI# 362 on file in the bankruptcy case, available on PACER.

[10] In fact, there is no rule requiring that an *administrative request for payment* under § 503 be verified, certified, or supported by documentation, and the IRS claim (R.157) does not contain any verification.  Rule 3001 refers to "creditors" and thus governs only *prepetition* claims under B.C. § 502, and not requests for payment of administrative expenses under § 503.  See 11 U.S.C. § 101(10) (defining creditor as an entity with a prepetition claim).  Cf. In re Indian Motocycle Co., 261 B.R. 800 (1st Cir. BAP 2001) (estimation provision in § 502 does not apply to administrative claims under § 503).  Also, Rule 3001(b) authorizes to be signed by non-lawyers. Among the reasons this case is important (apart from the not-insubstantial amount at issue) is that the IRS routinely files protective administrative claims after paying out tentative refunds to bankruptcy Debtors when a court sets an administrative claims bar date.  It has no other choice since failing to meet the bar date exposes the IRS to disallowance of a claim as "untimely."

word."[11]  (R.176.)  Creditor's Committee counsel then argued that the IRS already had seven

months to audit the return since the issuance of the tentative refund.[12]  (R.176-77.)

The bankruptcy court took the matter under advisement (R.177) and, later that day,

entered an order setting an evidentiary hearing for November 19, 2003, thereby giving the

government 111 days combined for an IRS examination and trial preparation by the Department

of Justice, including discovery.  (R.179.)  The order required the Debtor (presumably

Management) and Creditors Committee to provide access to all documents requested by the IRS

"forthwith."  (*Ibid.*)

Shortly thereafter, the Debtors and the Committee, and the United States, made their

respective automatic disclosures.  (R.196.)  The Debtors claimed to have no relevant records.

(R.188.)  Instead, "certain of the Debtors' tax related documents" were said to be in the

possession of counsel to the Committee and Henry Frye, who was identified as the Debtors'

former outside accountant.  (R.188.)  (The Examiner later testified that Mr. Frye declined the

Examiner's request to prepare the 2002 amended return, in part because it involved "substantial

changes" to the tax year 2002 results that Mr. Frye previously reported.[13]  (R.298.))

The pre-trial proceedings evince an ever-present disagreement between the government

and the Committee as to who had the burden of proof.  (Compare R.206 with R.209.)

---

[11] CPAs and other tax practitioners, such as Messrs. Wentzell and Rogers, are of course well aware that the IRS does this, as it is mandated by statute.  The IRS must pay out tentative refunds within 90 days of the request, "except that the Secretary may disallow, without further action, any application which he finds contains errors of computation . . . or material omissions."  26 U.S.C. § 6411(b).  On finding no computational errors or material omissions, the IRS has no right to refuse the tentative refund based on a determination to examine the return.  It must instead rely on its right to recover the money later if an examination reveals disallowable deductions, for example.

[12] As noted, however, there was no B.C. § 505(b) request for expedited audit submitted with the 2002 return, so the IRS, which normally has three years to examine a loss-year return and recoup a tentative refund under § 6411, first learned that the parties wanted the determination expedited when it received the claim objection and accompanying motion to rush.  Also, it was only shortly before that that the administrative claims bar date was set, forcing the IRS to file a protective claim or risk being foreclosed from filing a claim.

[13] But as noted in the statement of facts below, the amended return changed only a single item from the original return – adding the $450,000 deduction for "management fee expense."

Shortly before the evidentiary hearing, the United States requested, on an emergency basis, a 30-day continuance of the evidentiary hearing so that it could complete a thorough examination, which it had just recently begun due to "scarce resources." (R.209)  The motion noted that the government had concluded there were "issues of concern" with regard to the tentative refund. (R.208.)  It added that a 30-day continuance "would benefit the Debtors" as well, suggesting opposing counsel would wish to learn what issues the government might raise at trial, because it might be difficult for the taxpayer to meet its burden of proof if not alerted to the precise issues. (R.209.)  The bankruptcy court denied that motion (R.212), commenting later at the evidentiary hearing that it had done so because the United States gave "no justifiable reason" for a continuance. (R.241.)  When government counsel explained that the matter had "fallen through the cracks until quite recently," the court responded that, had somebody asked, it would have granted a default judgment against the IRS, but it would not do that on the day of trial.[14] (R.243.)

Approximately two days before the evidentiary hearing, the United States requested from the Committee, which had claimed to possess the Debtors' tax-related documents, copies of the Debtors' tax returns for the relevant periods (including the original Form 1120 for the loss year). (R.238-239.)  Rather than provide the requested documents, counsel for the Committee "directed" counsel for the United States to Mr. Frye, the Debtors' purported "outside accountant." (R.239.)  Mr. Frye, however, informed government counsel that he did not have any relevant documents. (R.400 n.11.)

At the evidentiary hearing, the Committee of Unsecured Creditors, prosecuting the Debtors' objection, again asserted that the United States bore the burden of proof, (R.239), and objected to having to offer any evidence in support of the objection to the administrative claim. (R.244.)  The bankruptcy court initially agreed with Committee counsel that the United States

---

[14] The way the matter had "fallen through the cracks" was that, after the Department of Justice informed certain IRS officials of the deadline, the IRS examination division apparently was not adequately apprised and/or reminded of the urgency, (R.388), and, because of other exigencies, could not shift its limited resources quickly enough.

10

bore the burden of proof (R.243), commenting that the IRS position on the burden of proof was "weird" because its contention that it had merely filed a "protective" claim "sort of belies your argument that it's entitled to *prima facie* evidence treatment." (R.243.)    Nonetheless, the court required the Committee to put on its case, adding that "whatever the burden is, I'm – at best, it's a very soft *prima facie* [claim] in any event." (R.243-44.)

As the bankruptcy court stated in its Memorandum (with a slight inaccuracy), the Committee's case consisted of two witnesses (the Examiner and Paul Rogers, an accountant "employed by the Examiner") and three exhibits – ICE's amended and original tax returns for tax year 2002, Management's amended tax return for tax year 2002,[15] and the Application for tentative Refund with attached tax returns for the carryback years. (R.409.; See also, Exhibits at R.315-385.) Mr. Wentzell testified that he had no first-hand knowledge as to any of the underlying facts and circumstances of any of the line-items on the tax return for the loss year (ended 6/30/2002). (R.258.) Similarly, Mr. Rogers testified that he did not examine the books and records of either ICE or Management (R.268.) He testified that he never conducted an examination of the Debtors' books and records, and that he accepted as true everything that was reported on the tax returns. (R.268-269.)

At the close of the United States' case, the parties again argued their respective positions as to the burden of proof. (R.306-309.) After repeating its position that the burden resided with the Debtors, the United States requested that the IRS be allowed to continue its investigation and that the record be kept open. (R.309.) The court denied the request, and deemed the record closed. (R.313.) The bankruptcy court then required the parties to submit post-trial memoranda regarding the burden of proof. (R.311.)

---

[15] The slight inaccuracy is that the court stated that Management's original tax return for tax year 2002 was attached to the amended return. The Court appears to have been confused by the "Form 1120" found at R.349. In fact, that is not a copy of the original Form 1120 which purportedly reported taxable income of negative $610,135. (R.329, line 2.) It is instead a Form 1120 created to support the Form 1139, with the figures as amended, as shown by the reported taxable income of negative $1,060,135 (the final NOL as reflected by the changes indicated on the Form 1120X at R.329). As noted, the United States was unable to get the Committee or the Debtor to produce the original return when it requested it several days before trial.

In its decision (discussed in greater detail in the statement of facts next), the bankruptcy court correctly ruled that the burden of proof was governed by I.R.C. § 7491, which places the burden on the taxpayer but, subject to certain conditions, shifts it to the IRS on any factual issue in respect to which the taxpayer introduces "credible evidence." The conditions include the requirement that the taxpayer substantiate its deductions, and that it cooperate in preserving and providing all required documentation and other information. Ultimately, the bankruptcy court sustained the Debtors' objection to the administrative claim, holding, *inter alia*, that the Debtors had presented credible evidence of their entitlement to the tentative refund. (R.415-418.)

This appeal followed.[16]

**Statement of Facts**

The Debtors in this jointly administered bankruptcy are ICE, Management, and ICE-Conn. (R.67-69.) ICE was incorporated in 1989 (R.319) and Management was incorporated in 1995 (R.337.) Management functioned as a management company to ICE and ICE-Conn. (R.247.) The three related companies were also under common management. (R.247.) That management consisted of Daniel Kennedy as Chief Financial Officer and David LeBlanc as President. (R.291-292.) Though under joint management, according to Debtors, only Management paid the salaries of Mr. Kennedy and Mr. LeBlanc. (R.291, 295.)

The various companies' tax returns since 1997 suggest that inter-company transactions were manipulated to reduce taxes.[17] Thus, in tax year 1997, when Management reported taxable income of only $351, officer salaries were not deducted on its tax return. (R.357.) Beginning in 1998, the salaries paid to corporate officers were deducted on Management's returns, reducing its

---

[16] The post-decision record in the bankruptcy case contains nothing to suggest that the settlement between the Creditors Committee and the bank that was supposed to fall apart unless the tax claim was finally withdrawn or disallowed by August 30, 2003, and under which those parties would share the spoils of the IRS refund if it was not held to have been erroneous, has in fact fallen apart. Rather, it appears that the bank is awaiting the outcome of this appeal.

[17] The Examiner's Report, filed early in the bankruptcy case, included the following statement: "Known irregularities in financial reporting and revenue recognition don't provide ample comfort that related party transactions were accounted for according to the substance of the transaction." (R.097.)

taxable income by $1,500,416.00 over the four years from 1998-2001.  (R.359, 361, 363, 364, 366, 370, 374, 379.)  While Management deducted Mr. LeBlanc's salary in computing its own taxable income, Mr. LeBlanc performed functions for ICE; he signed ICE's tax returns as its President (at least for fiscal year 2002) (R.315), had day-to-day oversight responsibility for ICE's operations and field installation (R.294), had principal responsibility for compiling estimates for ICE (R.294), negotiated with ICE's customers (R.295), purchased ICE's materials (R.295), and negotiated with ICE's suppliers (R.295.).  Yet ICE, which apparently had no taxable income to shelter, paid Mr. LeBlanc nothing for these services.[18]  For the 2002 year (the claimed loss year), Management deducted $105,603 each in salaries for Messrs. Kennedy and LeBlanc (R.333) – down from $302,380 each for 2001 (R.375).  But the 2002 return reports zero gross income and zero cash at year-beginning. (R.329, 335.)  The only source of funds shown on the returns is a reduction in the amount due from affiliates.[19]  Thus, presumably, the operating companies funded the $211,206 for the salaries, or the salaries were not paid.[20]

Similarly, Management claimed no depreciation deductions prior to the 1999 tax return, when it claimed $319,785 in depreciation, followed by another $232,211 for the 2000 tax year. (R.363, 366.)  Schedule L for 1999 is not in the record, but Schedule L for the 2000 year indicates accumulated depreciation as of the beginning of the year of $561,768 (on $1,133,360 in depreciable assets).  (R.369.)  Since this is more than the 1999 depreciation figure, it seems that

---

[18] The Committee's witness, Paul Rogers, was unable to state whether ICE made a profit during fiscal years 1997, 1998, or 1999, (R.284-285), and no exhibits were produced at the evidentiary hearing to indicate whether it reported any taxable income for those years.  (R.221.) ICE reported a loss, without a deduction for any salaries, in fiscal year 2002 (R.319), and Mr. Rogers testified that ICE likely had a loss in fiscal year 2001 (R.286.)

[19] Mr. Wentzell was unable to answer the question asked of him at trial as to whether this amount purportedly due from affiliates at the beginning of 2002, but not at the end of 2002, was ever paid.  (R.257-258.)

[20] In the Debtors' motion to sell its assets filed with the bankruptcy court on April 2, 2003, the Debtors, in describing the history of the companies and their organization, stated that Management was "a conduit for the payments of salaries and other benefits to the principals" for the operating companies.  (The motion was not designated for the appeal record but is subject to judicial notice and available on the bankruptcy court's ECF system – DI# 260 in Case No. 02-45451, at p.3.)

13

the same assets were being depreciated and thus sheltering income on one of Management's affiliate's returns prior to 1999.   Another $267,663 in depreciation is deducted for 2001, and another $373,998 for 2002.  (R. 374, 337.)  But Management supposedly did nothing more than manage its affiliates which were the principal operating entities.[21]

Management's sole source of income was the fees it received from the related operating companies.  (R.284.)  Its reported gross income for fiscal years 1997-2002 was as follows:

| Fiscal Year | Gross Income |
|---|---|
| 1997 | $1,000.00[22] |
| 1998 | $309,455.00[23] |
| 1999 | $966,559.00[24] |
| 2000 | $1,021,000.00[25] |
| 2001 | $1,618,147.00[26] |
| 2002 | 0.00[27] |

From its reported gross income, Management claimed deductions, resulting in the following net

---

[21] Curiously, the 2002 return reflects $1,699,162 in depreciable assets at year-end (6/30/02), whereas Management's bankruptcy schedules show assets as of the petition date, a couple of months later, consisting of one loan receivable from one of its officers and various vehicles of "unknown" value.  (R.340.)  (The schedules are not in the appeal record, but are subject to judicial notice and available on the bankruptcy court's ECF system – DI# 5 in Case No. 02-45453.)

[22] (R.357)

[23] (R.359)

[24] (R.363)

[25] (R.366)

[26] (R.374)

[27] (R.329, 349)

taxable income each year from fiscal year 1997 through fiscal year 2001:

| Fiscal Year | Taxable Income as Originally Reported |
|---|---|
| 1997 | $351.00[28] |
| 1998 | $182,802.00[29] |
| 1999 | $211,787.00[30] |
| 2000 | $287,049.00[31] |
| 2001 | $385,589.00[32] |

Management filed its original return for the fiscal 2002 (ended June 30, 2002) – the claimed loss year – on or about September 16, 2002.  (R.343, line 2b.)  It reported zero income as noted above, and deductions of $610,135, resulting in a claimed NOL in that sum.  (R.329.)

After the original fiscal 2002 return was prepared by Debtor's long-time accountant (Frye), Examiner Wentzell determined that ICE had a substantial amount of erroneous receivables on its books (R.251), and sought the advice of an accountant to amend the Debtor's income tax returns to increase the net operating loss and claim a carryback.[33]  (R.251.)  The accountant sought out by Mr. Wentzell, Paul Rogers, then prepared and signed amended tax returns and the resulting Application for Tentative Refund.  (R.250-253, 342-385.)

The amended return for fiscal 2002 (Form 1120X) made only one change – it increased total deductions by $450,000, thus increasing the claimed NOL to $1,060,135.  (R.329.)  The sole reason given was "TO ADJUST FOR AFFILIATED MANAGEMENT FEE EXPENSE."

---

[28] (R.357)

[29] (R.359)

[30] (R.363)

[31] (R.366)

[32] (R.374)

[33] As noted in the Statement of Proceedings above, Mr. Frye declined to be involved in altering the original return.  (R.298.)

(R.330.)  The $450,000 was also indicated on a revised Form 1120 as part of line 26 ("Other deductions"), supported by "Statement 2."  (R.337.)  Statement 2 includes the $450,000, which is described solely as "Management Fee Expense."  (R. 341.).

According to the Committee's two trial witnesses, the newly claimed deduction reflected the reversal of management fees collected by Management in prior years, due to Mr. Wentzell's determination that Management had mismanaged the collection of its affiliates' accounts receivables.  Thus, although Mr. Rogers at first stated on direct examination that the $450,000 was a reversal of fees "charged by [M]anagement to ICE in the Fiscal Year 2002" (R.266), he admitted on cross-examination that the reversal was actually for $450,000 "paid in prior years, and not the loss year." (R.281.)  In addition, as noted, the original loss year return reported zero income – so there was no reported income for that year to "reverse."

Mr. Wentzell testified that the management fees were reversed because Management was deemed unable to collect booked accounts receivable due from unaffiliated account debtors to ICE because of bad bookkeeping and other errors of Management in managing ICE's finances. (R.256-257.)  In other words, as Mr. Rogers clarified, the management company was undeserving of $450,000 of the fees it had already received (R.279, 283.)  In fact, Mr. Rogers claims to have based this $450,000 reversal on Mr. Wentzell's claim that the booked receivables were erroneous or uncollectible.  (R.279.)  Mr. Rogers did not use any formula to determine the precise amount of the reversal, (R.281), and the $450,000 reversal of management fees charged in prior years, and the increased NOL generated by it, were simply a result of his "seasoned judgment" that it was an amount that "could be justified" in light of discovering that $800,000 of the operating company's accounts receivable were uncollectible, and given that he had to make a quick determination in light of pressure from the bank to "settle claims" of the Debtors that could generate funds to satisfy the bank's secured claim.  (R.283-284.)  Coincidentally, the revised NOL figure, after adding the $450,000 additional deduction – $1,060,135 – was roughly equal to the combined taxable income for the years 1997-2001 (the five years to which the NOL could

possibly be carried back).[34]

In fact, the returns confirm that the $450,000 reversal was a paper accrual of a liability to ICE, by Management, which, at the time of accrual, could never be paid (because it was first conceived of by Messrs. Wentzell and Rogers after Management was in bankruptcy with insufficient assets to satisfy secured and administrative priority claims). Thus, schedule L "as amended" to ICE's Form 1120X (R.328) reflects an accrual of $450,000 "due from affiliate" as of the end of the tax year 2002 that was not indicated at the beginning of the tax year, establishing that it was accrued during the year and not paid. But, the receivable is not mentioned on ICE's original tax return. And, notwithstanding the listed $450,000 "due from affiliate" on ICE's amended return for the year ended June 30, 2003, ICE never filed a claim against Management in its bankruptcy case (and the bar date for prepetition claims has long expired). (R.058-66.)

The Application for Tentative Refund (Form 1139) filed with the amended returns claimed a net operating loss carryback of $1,060,135, reducing Management's reported taxable income for fiscal years 1997 through 2001 from a total of $1,067,578.00 to $7,443.00. (R.263, 343-44.) The post-bankruptcy application resulted in a tentative refund of $347,345.56. (R.214, 225, 253, 404.)

As noted in the Statement of Proceedings above, the Creditors Committee prosecuted the claim objection and the bankruptcy court held an evidentiary hearing on November 19, 2003, after which it called for post-trial memoranda on the burden of proof issue. Both sides agreed that I.R.C. § 7491 governed the issue.

The United States' post-trial submission discussed the $450,000 deduction for the reversal of (as an asserted liability to repay) management fees collected by Management from its affiliates in prior years, as well as several other issues with respect to which the witnesses at trial

---

[34] Normally NOLs may only be carried back two years, but Congress provided special relief for losses in years 2001 and 2002, providing a special five-year carryback period. See I.R.C. § 172. The final NOL was just $7,443 less than the $1,067,578 in taxable income for the 1997-2001 years combined.

testified they had no information whatsoever.[35]  The other issues discussed in the government's

post-trial submission included the officers' salaries, and the depreciation.[36]

The bankruptcy court issued its decision (R.403-418) on January 27, 2004, sustaining the

objection to the IRS claim.  The only specific item of income or expense that is addressed in the

court's decision is the $450,000 deduction for management fee expense claimed for the first time

on the amended return.  The bankruptcy court held that the management fee expense was merely

the removal of income from Management's original 2002 return that it had never in fact realized

because the Examiner had determined that Management was not entitled to collect a management

fee from its affiliates in that year due to mismanagement.  On this issue, the court determined that

the testimony of the two Committee witnesses was "credible evidence" within the meaning of

I.R.C. § 7491, thus shifting the burden of proof to the IRS, which the court found had failed to

rebut the testimony.  Among the findings in support of this conclusion was that "the Examiner

discovered that Management . . . had charged a management fee of approximately $450,000 for

FY 2002," which was reversed because I.C.E. had sustained losses "for this same period."

(R.404.)  In its later discussion under the heading "Credible Evidence," the court stated that

"Management charged ICE management fees of $450,000 for FY 2002," and that, because of

ICE's losses in this period, "Mr. Rogers determined that the [2002] management fees should be

---

[35] As noted, the only change that the Examiner and the accountant determined to make in amending the original return was the addition of the $450,000 management fee expense.  They testified at trial that they had no knowledge about any of the entries on the original return. (R. 258, 268-269)

[36] The $450,000 "management fee expense" was the only item that the Committee's post-trial memorandum discussed in applying the burden of proof.  Without citing the record, the Committee argued that the Examiner "identified substantial additional loss transactions of ICE beyond those previously identified in the original [tax returns] filed by ICE for fiscal years 2002 *and earlier*, and determined that the reversal of $450,000 in management fees previously charged to ICE by Management *for those fiscal years* (. . .) may be appropriate."  (R.224 (emphasis added.))  As noted above, however, Management's original return for fiscal 2002 reported zero gross income, and thus could not possibly have reflected any charge to ICE of management fees in that year.  Thus, the reversal could only have been *entirely* of management fees received by Management in the "earlier" years.

reversed."[37]  (R.414.)  Thus court thus concluded that the carryback of the NOL to earlier years was "solely to account for the increased loss incurred by Management as a result of the reversal of the 2002 management fee."  (*Ibid.*)

The bankruptcy court did not specifically address whether Debtor had submitted "credible evidence" on any other items on the loss-year return, and also did not address the IRS's argument that under I.R.C. § 7491, deductions must be substantiated for the burden to be shifted to the IRS (although the argument was acknowledged[38]).  Apparently addressing that argument indirectly, the court observed that the Committee did not bring the Debtor's books and records to the hearing and, in a footnote, stated:

> The Court cannot penalize the Committee or the witnesses for not having every answer and document necessary to respond to the IRS's questioning [at trial] as they were given virtually no prior guidance by the IRS as to the basis of the IRS Claim.  To reward the IRS for its "ambush" tactics would fly in the face of the clear legislative purpose of section 7491.[39]

The bankruptcy court apparently construed the government's position as attacking the credibility of the Committee's witnesses, ruling that they were experts whose credibility would be weighed based partly on their qualifications.  (R.415.)

Finally, the court ruled that the IRS's administrative claim was not entitled to a presumption of validity because it was simply a "place-holder."[40]  (R.15)

### SUMMARY OF ARGUMENT

The arabic-numbered paragraphs of the following summary track the issues listed above and the roman-numbered parts of the full argument below.

---

[37] Again, the opinion does not cite to where in the record the court got the idea that a management fee had been charged for 2002, before being reversed through the deduction reported as "management fee expense," on a tax return that originally reported zero gross income for the year.

[38] (R.409.)

[39] (R.415 n.7.)

[40] The IRS concedes this issue and does not herein argue that its claim was entitled to any presumption of validity under the circumstances.  But, to the extent the bankruptcy court implied that this might have relieved the taxpayer of the requirements of § 7491, we disagree.

19

**1. $450,000 Management Fee Expense Deduction Not Proper**.  The bankruptcy court's finding that the $450,000 deduction for "management fee expense" was the reversal of income previously reported as accrued for the 2002 tax year is clearly erroneous.  The amended return indisputably refutes this finding as it states that zero income was reported on the original return. Both witnesses testified that it was the reversal of fees collected by Management in prior years.

Additionally, both explained the genesis of the deduction as reflecting a determination that Management had mismanaged the operating companies, thus revealing that the deduction actually reflects some sort of tort or breach of contract liability.  As such, it could not be accrued in the 2002 tax year because it was not "fixed and determinable" during that year, as required by the tax code and regulations.  To the contrary, Mr. Rogers admitted that he fixed the liability using his own "seasoned judgment" as to an appropriate sum, and he was not involved until well after the close of the tax year.

Moreover, neither Mr. Rogers nor the Examiner had the authority to impose a liability on Management during the bankruptcy case without causing it to file a timely claim against its co-debtors.  And the claims bar date expired without any such claim having been filed.

**2. No Credible Evidence On Other Issues.**  Shifting the burden of proof to the IRS under I.R.C. § 7491 depends upon the taxpayer having introduced "credible evidence" on any disputed item.  Preliminarily, the taxpayer did not prosecute the claim objection and the Creditors Committee, which did, cannot invoke the burden-shifting provision.

More fundamentally, the Committee did not even attempt to introduce any evidence, let alone credible evidence, on any issue other than the $450,000 management fee expense (in respect to which, as noted above, it succeeded in disproving its own case).  The tax returns cannot qualify as "credible evidence" of the correctness of the assertions made thereon.  The tax return itself is an admissible business record, but the assertions on a tax return as to the transactions reflected constitute hearsay.  The two witnesses called by the Committee admitted that they lacked any personal knowledge about any of the entries on the amended 2002-year return except for the management fee expense deduction that they had conceived in amending the

return.

The bankruptcy court's opinion effectively excused the Committee from having to introduce credible evidence on other issues on the premise that the IRS had failed to identify the issues prior to trial.  But the government, in moving for a 30-day continuance, noted that the Committee and Debtors might benefit from the delay by enabling the government to identify areas of concern prior to trial, rather than simply cross-examining the taxpayer's witnesses.  So it is not entirely fair to blame the IRS for the Committee's lack of preparedness.

More importantly, it is untenable to argue that issues for trial were unknown.  The IRS claim was for the tentative carryback refund sent out postpetition.  It was thus beyond question that the taxpayer would have to introduce credible evidence to support that it incurred a net operating loss able to be carried back, and in what amount.  This obviously engendered showing the lack of income, and providing evidence in support of the three major deductions contributing to the NOL (management fee expense, officer compensation, and depreciation).

At all events, the statute that enacted I.R.C. § 7491's burden-shifting provision specified that it would apply in cases even where there had been no IRS administrative examination.  Accordingly, the bankruptcy court had no discretion to carve out an equitable exception to meeting the conditions for shifting the burden of proof, including the requirement that the taxpayer introduce credible evidence.

**3. Lack of Substantiation.**  Another requirement for shifting the burden of proof is that the taxpayer comply with the tax code's substantiation requirements.  This includes retaining and producing records sufficient to substantiate income (or lack of it) and deductions.

In the instant case, the substantiation requirement takes on particular importance given that the claimed NOL reflects a reversal of the taxpayer's established pattern of shifting all income from its operating companies to Management, and also reflects almost precisely wiping out all income in the five years to which an NOL from 2002 could legally be carried back.  And, each of the large deductions on the 2002 return are hard to reconcile with other items on the various returns.

**4. Lack of Records Production.**  The burden-shifting provision also requires a taxpayer

21