to maintain records sufficient to substantiate its deductions and comply with reasonable requests for information and documents. The Debtors referred government counsel to the Committee, which referred government counsel to the taxpayer's former accountant, Mr. Frye. But Mr. Frye stated that he did not possess the taxpayer's records. The Committee and Debtors failed to comply with the government's request to produce even the original tax return for the year of the supposed net operating loss. While admittedly this request was not communicated until several days before trial, the request was for a document that was clearly something that anyone prosecuting the tax claim objection should have been planning to bring to trial anyway.

**5. The 30-day Continuance Should Have Been Granted.** Finally, the government maintains that the bankruptcy court's denial of the 30-day continuance was an abuse of discretion under all the facts and circumstances. The government admits that its efforts to comply with the bankruptcy court's 111-day schedule to audit the return and prepare for trial were not what they should have been, but that was due to miscommunications and was certainly not willful. On the other side, the rush created by motions to expedite in this case was entirely artificial, and the claim for tentative refund is highly suspect and appears to have been manipulated.

Beyond weighing the relative fault of the IRS against the interests in achieving a just result, the IRS in this case was not even given the time that Congress stated in § 505(b) of the Bankruptcy Code should be allotted for an expedited determination under that section, and the Department was not given the time for trial preparation *after* the conclusion of such investigation that should be permitted in light of an administrative tax claim in excess of $300,000.

## ARGUMENT

### I.  THE $450,000 "MANAGEMENT FEE EXPENSE" IS NOT AN ALLOWABLE DEDUCTION

#### A.  The Court's Finding that the $450,000 "Management Fee Expense" Was Merely a Reversal of Unrealized Income Reported for 2002 is Clearly Erroneous; the Testimony and Exhibits are Uniform to the Effect that the Deduction was a Reversal of Management Fees Collected by Management in Prior Years

The bankruptcy court's finding that the $450,000 deduction for management fee expense was a reversal of unpaid management fees charged by Management to ICE for the 2002 tax year

(R.404) was clearly erroneous.  Although Mr. Rogers at first made a statement to that effect on direct, he admitted on cross-examination that his initial supposition was wrong and that, in fact, the reversal was actually for $450,000 "paid in prior years, and not the loss year."  (R.281.)  Mr. Wentzell – the only other witness, agreed.  (R.301-302.)

Their testimony is supported by the trial exhibits.  As noted, the only change from the original to the amended 2002 return was the addition of the $450,000 deduction, and the original return (like the amended return) reported zero income.  (R.329.)  So there was no reported income for the year to "reverse."  And the revised Form 1120 attached to the application for tentative refund, which includes the addition of the $450,000 deduction, also shows that Management had no income at all in FY (fiscal year) 2002. (R.349, 355.)  It would also be illogical to report the reversal of income *in 2002* as a *deduction* for 2002 – rather, if that was in fact the situation, the amended return would simply have adjusted downward a previously reported income figure.

Thus, all of the evidence points one way – the bankruptcy court's factual finding as to the nature of the $450,000 deduction was clearly erroneous.  As noted next, the witnesses' explanations as to how and why there was a reversal of management fees paid in earlier years only adds to the impropriety of the deduction.

**B.     As a Liability for Mismanagement in Prior Years, the "Management Fee Expense" Was Not Fixed and Determinable for Purposes of Tax Accrual**

The witnesses both testified that the foundation for the deduction was that the management company was undeserving of $450,000 of the fees it had previously charged. (R.256-57, 279.)  Accordingly, once it is understood that the reversal was of fees collected by Management in prior years, it is clear that the figure is a supposed liability in the nature of a tort liability or breach of contract liability.  This is also confirmed by the fact that schedule L "as amended" to ICE's Form 1120X (R.328) reflects an accrual of $450,000 "due from affiliate" as of the end of the tax year 2002 that was not indicated at the beginning of the tax year.  In other words, ICE's amended return reported a receivable owed to it by Management, which obligation supposedly arose during the 2002 tax year.

23

As a disputed tort or breach of contract liability, the amount is not fixed and determinable until a judgment is rendered, and therefore the loss generated by the liability cannot be accrued. 26 U.S.C. § 461(h)(4); 26 C.F.R. § 1.461-1(a)(2). As an agreed contractual debt, to be fixed, the amount must have been agreed upon during the tax year. There was obviously no agreement during the tax year in light of the difference between the original Schedule L and the amended Schedule L. Moreover, Mr. Rogers testified that he did not use any formula to determine the amount of the reversal (R.281). Rather, the $450,000 reversal and NOL generated by it were simply a result of his "seasoned judgment" that it was an amount that "could be justified" in light of discovering that $800,000 of the operating company's accounts receivable were uncollectible, and given that he had to make a quick determination in light of pressure from the bank to "settle claims" of the Debtors that could generate funds to satisfy the bank's secured claim.[41] Obviously he did not make this "seasoned judgment" during the tax year, since the tax year ended before he was retained. Mr. Rogers booked as an expense the reversal of $450,000 of fees purportedly paid to Management by ICE in prior periods, without any knowledge as to how those fees were originally determined and without any formula to determine the reversal amount. To the extent the $450,000 debt is real (which it is not), the proper year in which to deduct it would, at the earliest, have been the year in which it was agreed upon.

This alleged paper "expense," being between related taxpayers under common ownership and control, would be inherently suspect in any case, and is doubly so in view of the fact that it just happens to be the sum that was required to bring the total NOL for 2002 up to the amount of

---

[41] (R.283-284.) The inescapable inference at the bottom of page 50 of the transcript (R. 283) that the bank was pressuring the debtor's tax accountant to quickly amend the tax return for the purpose of obtaining a tentative refund is quite remarkable. The bank, as noted, had a security agreement that purports to place a lien on tax refunds (among other things), leaving the bank in a position to receive the proceeds of any tax refund paid to the Debtors, including the $347,345 at issue here. To that end, the bank had input into the selection of the Examiner that conceived the claimed NOL, rushed Mr. Rogers to file a § 6411 application for tentative refund, moved to rush the IRS in its examination of the tentative refund, and sought to rush the case to trial. The bank justified the rush on the basis of the bank's settlement agreement with the Creditors Committee in which the bank asserted that it would scuttle the deal if the IRS's potential right to recoup the tax refund was not quickly terminated. Thus, the emergency that prevented the IRS from having adequate time to audit and litigate the tax liability was an artificial emergency created by the bank itself.

total taxable income reported for the five years to which the 2002-year NOL could be carried
back (approximately $1,060,000).  Additionally, Mr. Rogers' explanation of the reason for the
reversal does not remotely fit the treatment on the return, which is grossly misleading.  If
Management had mismanaged ICE, and was therefore undeserving of fees paid in prior periods,
that would not justify reporting a deduction as a "management fee expense," which sounds like a
payment for management services.[42]  (See line 26, "Other Deductions" at R.337, referencing
"Statement 2" at R.341.)  A more fitting label would be "prior-year management overcharges
liability."

> C.    **The Creation of the $450,000 Liability Exceeded the Examiner's
> Authority (And the Debt was Not Timely Claimed)**

The $450,000 liability for supposed past mismanagement could not even be fixed when
the amended tax return was conceived, at least in the manner it was determined, since the
Examiner lacked authority to allow claims.  The Examiner, appointed under 11 U.S.C. § 1104,
had specifically enumerated powers.  Those powers were as follows: (1) supervisory control of
the "Debtor's" (presumably the Debtors') billing and accounts receivable collection practices; (2)
the right to outsource the Debtors' billing and accounts receivable; (3) ultimate responsibility for
the Debtors' job selections; (4) to investigate and report to the parties in interest and the court on
the accounts receivable and the accounts receivable insurance program; (5) to verify and approve
all expenditures of the Debtors; (6) to evaluate and report on the Debtors' inventory control
options; (7) to direct where the Debtors' bank accounts can be located; (8) to supervise all
aspects of the Debtors' business, to the extent the Examiner deems appropriate to ensure that the
Debtors timely perform their obligations as debtors in possession under Chapter 11 and the
guidelines established by the U.S. Trustee.  (R.070-071.)  These powers obviously do not include
the authority to assert, on behalf of ICE, a claim against Management, and then to consent, on
behalf of Management, to the claim.

---

[42] Indeed, when Mr. Rogers was first asked on cross-examination a question as to what
contributed to the management fee expense, he described services provided by Management to
ICE (apparently having completely forgotten for the moment what the label on the tax return
meant).  (R.272-73.)

The three debtors' bankruptcy cases are not substantively consolidated; they are simply being jointly administered (sometimes referred to as administratively consolidated). While one docket is used by the clerk of the bankruptcy court, therefore, to enter motions, etc., dividing lines are maintained as to which debtor owns which assets and which is liable for what debts.[43] Thus, the clerk of the bankruptcy court maintains separate "claims registers" under Bankruptcy Rule 5003(b). The claims register for Management reflects no claim filed against its estate on behalf of ICE (R.058-066), and the prepetition claims bars date expired on April 11, 2003. (R.127-28).

Since prepetition inter-company claims are thus time-barred, and have been since before the Debtors even filed the objection to the tax claim, it is simply untenable to thereafter uphold a tax deduction for this belatedly concocted $450,000 prepetition "management fee expense" liability.

Finally, even at the time the $450,000 deduction was first conceived, it was already clear that it could never be paid. An obligation to pay cannot properly be accrued for tax purposes if there is essentially no chance that the taxpayer will ever be required to pay it. In In re Southwestern States Marketing Corp., 179 B.R. 813 (N.D.Tex. 1994), aff'd 82 F.3d 413 (5th Cir.1996), the Court held that a corporation may not accrue an expense that cannot possibly be paid because there is no possible source for its payment.[44] See also Gold Coast Hotel & Casino v. United States, 158 F.3d 484, 489 (9th Cir. 1997)(for a liability to be properly accrued, the amount must be "fixed" and there must be a "reasonable expectancy" of payment); McDonald v.

---

[43] When two estates are "substantively consolidated," their assets are combined into a single pool to satisfy their combined liabilities. This is usually done for alter egos, for example, and requires a finding that it is justified.

[44] We also note that Southwestern States Marketing Corp. held alternatively that a change in accounting method from the accrual to the cash method would be required in order to clearly reflect income if a bankruptcy debtor with no possibility of paying claims was otherwise able to accrue deductions for the sole purpose of claiming alleged loss carrybacks to wipe out tax in years in which it had reported taxable income. However, we do not think the court was correct in holding that the accounting method may be changed without the IRS's determination to change it. Nevertheless, the court's observations confirm the inappropriateness of the belatedly conceived management fees deduction here, conceived of solely to generate a carryback to claim a refund of taxes from prior years.

Commissioner of Internal Revenue, 114 F.3d 1194, 1997 WL 284819, **6 (9th Cir. May 23, 1997). It cannot be accrued because the Internal Revenue Code requires that all events necessary to fix the liability have occurred before a liability is accrued. 26 U.S.C. § 461(h)(4). All events necessary to fix the liability can occur only if it is at least possible that the obligation will be paid. Gold Coast Hotel & Casino at 489. Here, by the time the Examiner and his accountant conceived of the $450,000 expense, it was clear it would never be paid. At the time the amended returns were filed, Management was in bankruptcy with virtually no hope of reorganization and a liquidation value insufficient to satisfy secured and administrative claims. Its bankruptcy schedules reported liabilities that exceeded assets by more than $2,400,000. But even if there was a hope of payment, the expense was neither fixed and determinable before the end of the tax year, nor properly claimed (or even properly disclosed) under the Bankruptcy Code.

## II.    THE TAXPAYER DID NOT INTRODUCE CREDIBLE EVIDENCE ON ANY OTHER ISSUE

The bankruptcy court's decision, sustaining the objection to the IRS's claim, is largely or entirely based on the court's holding that the taxpayer produced credible evidence, (see, R.410-416), thereby shifting the burden of proof to the IRS. The bankruptcy court's heavy reliance on the shifting of the burden of proof is demonstrated throughout its opinion, and is made clear by its statement that "[t]he burden of proof that is *crucial to the resolution of the Objection* relates to the burden of proving, or disproving, the IRS's entitlement to the return of the [tentative] refund[,]" (R.410) (emphasis added), and that the placement of that burden is governed by I.R.C. § 7491, which places it "at least initially...with the taxpayer." (R.411.) The court's shifting to the IRS of the burden of proof, upon which it so heavily relied, was erroneous.

With the burden of proof, at least initially, squarely upon the taxpayer, the taxpayer must first produce "credible evidence with respect to any factual issue" relevant to ascertaining its tax liabilities. I.R.C. § 7491. It did not even attempt to do so, except with respect to the management fee expense deduction (of which the evidence uniformly negates the right to deduction).

27

## A.    The Committee is Not the Taxpayer

As an initial matter, the Debtors did not appear at the evidentiary hearing to produce any evidence, credible or other.  Instead, as the bankruptcy court noted, the matter was prosecuted by the Creditors Committee.[45]  (R.403.)  As it is not the taxpayer, the Committee cannot take advantage of the burden-shifting provision of 26 U.S.C. § 7491(a), which applies to the production of credible evidence *by the taxpayer*.  Thus, the burden of proof remains with the Committee.

While this argument may at first blush seem hyper-technical, there are sound policy reasons to construe the statute the way Congress fashioned it.  As argued more fully in part IV, *infra*, (on the requirement to maintain records and cooperate in providing information), all evidence and information related to an income tax liability is initially under the control of the taxpayer and unknown to the IRS.  Apart from enabling the IRS to use information provided during an administrative investigation, the introduction of evidence at trial *by the taxpayer* enables the government to use the tool of cross examination to help assure that the item claimed is appropriate, by searching for inconsistencies and otherwise testing the credibility of the evidence introduced by the taxpayer.

## B.    The Taxpayer Was Required to Introduce Credible Evidence on All of the Items that Contributed to the NOL, and Failed to Do So

The bankruptcy court exercised its authority under 11 U.S.C. § 505(a)(1) to "determine the amount...of any tax..." imposed upon the Debtors.  To that end, and with the initial burden of proof, the taxpayer, here Management, must produce "credible evidence with respect to any factual issue" relevant to ascertaining its tax liabilities.  Management's tax liabilities here may only be ascertained upon the presentation of evidence encompassing fiscal year 2002 records, as well as records for the carryback years 1997 through 2001, because the claimed NOL carryback

---

[45] The Official Committee of Unsecured Creditors appointed by the U.S. Trustee, under, 11 U.S.C. § 1102, (R.078), is comprised of prepetition unsecured creditors, and is not the taxpayer, or even a taxpayer.  Under 11 U.S.C. § 1103, the attorney for the Committee "may not...represent any other entity having an adverse interest in connection with the case."  As such, Committee counsel, representing creditors in a bankruptcy, cannot, and did not, allege to have represented the taxpayer, here the Debtor, Management.

to those years reduced Management's reported tax liabilities, and generated the tentative refund at issue. An NOL, such as the one that generated the carryback, is defined as "the excess of the deductions allowed by [Chapter 1 of Subtitle A of the I.R.C.] over the gross income" for the tax year. 26 U.S.C. § 172(c). It is then axiomatic that, in order to determine the validity of a claimed NOL carryback, and a resulting tax refund, a court must review, and a taxpayer must present credible evidence regarding, the gross income and all deductions that resulted in a claimed NOL.

While the Debtors failed to appear, and thus produced no evidence at all, the Creditors Committee produced no credible evidence with respect to the Debtor's tax liabilities beyond evidence pertaining to the $450,000 "Management Fee Expense" deduction for 2002, and which wholly supports the IRS's administrative claim. The Committee's evidence, while supporting the IRS's claim, specifically addresses only $450,000 out of more than $1 million of deductions, and does not specifically address gross income.

Here, the Creditors Committee put forth only the testimony of two witnesses who (as demonstrated below) admitted they lacked knowledge as to all but one of the items comprising the claimed NOL. Their only exhibits were ICE's 2002 tax return, Management's amended tax returns and claim for tentative carryback, with unsigned attachments. Those are mere assertions of an entitlement.

Without any substantiating evidence, tax returns are useless in establishing an entitlement, since the entries in the return are hearsay. "A tax return is merely a statement of the taxpayer's claim and does not establish the truth of the matters set forth therein." Meyer v. Commissioner, T.C. Summary Opinion 2003-46. 2003 WL 2002500 (U.S. Tax Ct.)(citing Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). The tax returns are of course admissible to show that they were filed and to show what the taxpayer claimed, but not to show that the facts represented thereon are true.[46] The impossibility that a tax return could substantiate a claim was

---

[46] It is black-letter law that simply because a document meets an exception to the hearsay rule, such as Fed.R.Evid. 803(6) or (8), does not mean that each and every statement within the document is admissible for the truth of the matters asserted. Rather, if the document contains further levels of hearsay, the statements are not admissible to prove the truth of the matters asserted unless another exception to the hearsay rule is demonstrated. Here, the returns were

in fact admitted by Paul Rogers, the Committee's witness. (R.278.)

The credible evidence requirement would be rendered meaningless if the taxpayer, or in this case a third party, merely had to introduce tax returns that assert the taxpayer's entitlement in order to meet the requirement. Congress might just as well have said "If, in any court proceeding, the taxpayer introduces its tax returns, the Secretary shall have the burden of proof."

As to the testimony, the two witnesses called by the Committee at the evidentiary hearing admitted to lacking any first-hand knowledge of any of the items on the original 2002 tax return, which were duplicated on the amended return. Mr. Wentzell testified that he had no first-hand knowledge as to any of the underlying facts and circumstances of any of the line-items on the June 30, 2002 loss-year tax return, beyond the $450,000 amendment he directed Mr. Rogers to make, and that he did not examine the transactional detail for fiscal year 2002. (R.258.) Similarly, Mr. Rogers, who had no personal knowledge of the transactions involved, testified that he never conducted an examination of the Debtors' books and records, and that he accepted as true everything that was reported on the tax returns. (R.268-269.) He further testified that the original tax returns he received from Mr. Wentzell formed the entire basis for his purported knowledge as to the loss year, 2002, with the exception of the $450,000 "Management Fee Expense."

The bankruptcy court stated in its Memorandum, (R.414), that the witnesses are experts, and, as such, were not required to testify as to the facts underlying their opinions. First, the witnesses were not qualified at the evidentiary hearing as experts, and no expert report was ever provided, though required under Fed.R.Civ.P. 26(a)(2) made applicable by Fed.R.Bankr.P. 7026. More importantly, although opinions of experts may be introduced without their having personal knowledge of the facts on which the opinions are based, there is no rule providing that experts may be used to prove specific facts of which they lack personal knowledge. In addition, even when opinion testimony is offered by an expert, the expert may be required to disclose the

---

admissible, without more, to show what was represented to the IRS. To establish that those representations were true, however, would require another exception to the hearsay rule or other evidence.

underlying facts or data on cross-examination.  Fed.R.Evid. 705.  The United States maintains that Mr. Rogers's and Mr. Wentzell's assertion of facts, not opinions, are inadmissible to prove those facts, and therefore do not provide credible evidence of those facts.

As the bankruptcy court observed, the legislative history of § 7491 clarifies that the phrase credible evidence means the following:

> The quality of evidence which, after critical analysis, the court would find
> sufficient upon which to base a decision on the issue if no contrary evidence were
> submitted (without regard to the judicial presumption of I.R.S. correctness).

H.R. Rep. No. 105-599, at 240-241 (1998).  (R.412.)  A review of the testimony leads to the conclusion that there was no credible evidence offered to support the claimed NOL – that is no evidence on which to base a decision even absent contrary evidence.  Instead, there was unsupported assertions and hearsay (or possible double or triple hearsay), except for the credible evidence that the Management Fee Expense deduction was improper.  Far from meeting the standard for credible evidence, the testimony offered by the witnesses is largely inadmissible because it was not based upon personal knowledge (except as to the $450,000 "Management Fee Expense" deduction).  Fed.R.Evid. 602.

The exhibits add nothing.  A tax return is not sufficient evidence upon which to base a decision on any issue, even in the absence of contrary evidence, unless there is evidence that the person who completed the return, here Mr. Rogers, based his statements on personal knowledge of the underlying facts.  Rule 602 of the Federal Rules of Evidence confirms this.[47]

Moreover, in this case, there is substantial evidence demonstrating that the Debtors are **not** entitled to an NOL carryback, and that evidence is discussed below.

---

[47] The taxpayer's failure to introduce evidence that is required to be within its control gives rise to a presumption that the evidence, if provided, would be unfavorable to it.  See O'Dwyer v. Commissioner, 266 F.2d 575, 584 (4th Cir. 1959); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946).

C.    **The Court Erred in Modifying the Statutory Requirement that the Taxpayer Introduce Credible Evidence (or Substantiate its Income and Deductions) on the Premise that the IRS Had Failed to Identify the Items It Intended to Question**

The pre-trial proceedings evince an ever-present disagreement between the government and the Committee as to who had the burden of proof. As the bankruptcy court noted, the IRS asserted "in both [its] Emergency Motion to Continue and its Prehearing Memorandum...that the Debtors had the burden to prove, by 'substantial evidence,' that" they are entitled to the tentative refund. (R.408; see also, R.206, 209.) Meanwhile, the Committee argued through pretrial proceedings that the IRS bore the burden of proof from the outset. (R.239.) The Committee went so far as to object to having to offer any evidence, as it wished to rely on its erroneous conclusion as to the initial burden of proof. (R.244.) Again, in closing arguments at trial, the Committee asserted that the IRS bore the burden of proof. The government, on the other hand, requested, to no avail, that the record be left open for additional evidence. It was only after trial, during preparation of court-ordered memoranda on the burden of proof issue, that the Committee recognized that the government did not have the initial burden of proof. (R.410.)

The Committee's reliance on its steadfast misunderstanding of the burden of proof led to its inability to meet its burden. The government predicted such a result, in light of the Committee's Prehearing Memorandum, and argued in its motion for an additional 30 days that additional time would have a secondary benefit of enabling the government to inform the Debtor of the specific items on the tax return that it would question at trial.

After denying the IRS's motion for an additional 30 days, the bankruptcy court effectively ruled that, because the taxpayer lacked advance notice of what the government would question, the taxpayer was relieved of meeting the conditions for shifting the burden of proof to the IRS under I.R.C. § 7491. (R.415 n.7). In this regard, the bankruptcy court erred.

The Committee was on notice of what it needed to demonstrate at trial (and the items the government might question could have been anticipated). The administrative claim was accompanied by a statement of an IRS representative that the claim was "for the tentative carry-back refunds sent out post-petition." (R.156). The Debtors were aware of that statement, and, in

fact, appended it to their claim objection.  In its Prehearing Memorandum, the United States asserted that the Debtors were required to come forward with "substantial evidence that they are entitled to the tentative refund."  (R.206.)  Since the issue for trial was clearly the entitlement to the tentative refund based on an NOL carryback, the Debtors and the Committee should have been prepared to present evidence necessary to establish the existence of an NOL.  A cursory review shows that the NOL at issue here is made up of only five items on the Debtor's 2002 amended tax return– zero gross income, deductions for taxes and licenses, interest, depreciation, and "other deductions."  (R.337.)  The Committee was prepared to, and did, address only one of these five items ($450,000 of $452,459 in "other deductions.")  It is difficult to imagine that any seasoned certified public accountant, such as the two presented as witnesses by the Committee, and any well-prepared attorney, could be unaware of what items might be questioned at a trial on an NOL.  Of course, it was the Committee's misplaced reliance on the burden of proof that led to its ill-preparedness.

In any event, regardless of the reason for the failure of the taxpayer to produce credible evidence (or substantiate its lack of income and its deductions[48]), the court erred in modifying the statutory requirement that it do so.  Section 7491 does not make any provision for such a modification.  Indeed, § 3001(c) of the Internal Revenue Service Restructuring and Reform Act of 1998 (Pub. L. No. 105-206, 112 Stat. 685, 727) provides that now § 7491 applies to examinations after July 22, 1998, and "[i]n any case in which there is no examination, [§ 7491] shall apply to court proceedings arising in connection with taxable periods or events beginning or occurring after such date of enactment."  Pub. L. No. 105-206, § 3001(c)(2).  Thus, Congress explicitly recognized that there might be judicial proceedings without an IRS examination.  By doing so, Congress authorized the shifting of the burden of proof only when all provisions of § 7491(a) are met, and the limitations it placed upon the use of § 7491 to shift the burden apply in

---

[48] See section III below for a discussion of the lack of substantiation.

all cases.  The bankruptcy court had no discretion to modify the statutory requirements.[49]

### III.   THE TAXPAYER DID NOT SUBSTANTIATE ITS LACK OF INCOME AND ITS DEDUCTIONS

Section 7491 also conditions burden shifting on the taxpayer's compliance with the requirement to substantiate any item relevant to an issue underlying a disputed deficiency.  According to the Conference Report on the addition of § 7491, this includes any requirement "generally imposed" (the Conference Report includes a footnote citing I.R.C. § 6001 and its regulations) or any requirement imposed with respect to specific items such as charitable contributions.  H.R. Conf. Rep. No. 105-599, at p. 242, 1998-3 C.B. 996 (1998).  The regulations under § 6001, in turn, require, maintenance of records "sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by...in any [tax] return."  26 C.F.R. § 1.6001-1(a).

The taxpayer did not comply with this requirement for items contributing to the claimed NOL.  The lack of substantiation in this case cannot be overlooked as some sort of technicality without consequences.  While the bankruptcy court looked only at the deduction for $450,000, and made an erroneous factual determination with respect to that deduction, there are numerous other facially improper entries and omissions on the claim for tentative refund, related to both income and deductions, that warrant at least a suspicion that the tentative refund was improper.  Therefore, absent substantiation, the NOL should be disallowed.

The claimed NOL carrybacks indicate a reversal of an established pattern of Debtors' business activity in order to generate the tentative refund.  In order to claim a NOL carryback and

---

[49] Since § 6411 refunds are explicitly "tentative," it is worth examining what would have been the case if the IRS had failed to grant the application and had the taxpayer brought a tax refund suit under B.C. § 505(a)(2).  In that event, § 7491 would still have applied, but the government would have been the defendant in an adversary proceeding.  See Fed.R.Bankr.P. 7001(1).  If the government simply failed to conduct discovery by a discovery deadline, that would not have provided any basis for the bankruptcy court to relieve the taxpayer of the requirements of § 7491 in order to shift the burden of proof to the government.  Stated another way, if any sanction was appropriate here for the government's shortcomings, it was simply to require the government to go to trial without the benefit of an administrative investigation or pretrial discovery.  It was not a basis to alter statutory rules.

generate a tentative refund, Management, and not ICE, had to generate an NOL to carry back to prior years, since, as Mr. Rogers admitted, only Management had generated profits in prior years against which a loss could be carried back (R.285-287.)[50]  During the 2002 tax year (the claimed loss year), just months before the Debtors' bankruptcy filing, Management purportedly generated a loss of $1,060,135 ($610,135 of which was on the original return).[51]  That loss was its first loss since at least before the tax year ended June 30, 1997, the earliest carryback year (R. at 284-285; Ex. 3, R.357-385.)  In fact, Management's taxable income before the claimed NOL carryback, which had increased each tax year since that ended June 30, 1997, was $385,589 during the year preceding the loss year (R.374), before the purported NOL eliminated that taxable income.

The I.R.C. contains a special five-year NOL carryback provision for NOLs incurred in tax years 2001 or 2002 (see 26 U.S.C. 172(b)(1)(H)), and the Debtor's claimed NOL here, as amended, was enough to wipe out all but $7,443 of $1,067,578 of previously reported taxable income for precisely five carryback years (or 99.3% of previously reported taxable income for the five allowed carryback years).  Because it suddenly and purportedly realized a loss, Management was able to claim a tentative refund from the United States of $347,345.56.

---

[50] Based on the Examiner's report and the hearing exhibits, a reasonable inference can be made that the only purpose to the corporate structure– a profitable management company "managing" unprofitable and related operating companies– was the avoidance of state income taxes.  The three companies' lines of business are non-union electrical contracting, energy management, and data communications/network installation.  (R.083.)  ICE was incorporated in 1989, and Management incorporated six years later, in 1995.  (R.319, 349).  ICE-Conn. is organized in Connecticut, while all other state activity "flow[ed] through" ICE.  (R.083.)  ICE, through which all state activity was conducted (other than Connecticut activity), filed state tax returns in each state in which it operated (R.083), though it reported no taxable income for tax years ended in 2001 and 2002.  (R.285-286; 319.)  In contrast, ICE's sister corporation, Management (R.247), realized income in each fiscal year from 1997 through 2001 (R.284-285), had no business operations other than management of the related operating companies (R.280), was located in Massachusetts (R.329, 337, 343, 349, 357, 359, 361, 363, 364 366, 370, 374, 379), and was not the flow-through entity for state operations (R.083.)  By reporting income in only one state, the related companies avoided taxation of its multistate operations in all but that one state.  Now, only the reversal of the practice that enabled state tax-avoidance could generate a federal tax refund, as only Management reported a profit against which a loss could be carried back to generate the tentative refund.

[51] There can be no doubt that even without the belatedly conceived Management Fee Expense of $450,000, a claim for a carryback would have been filed by Management, claiming a refund of a lesser sum.

Additional facial improprieties include the following:  (I) Management had no gross receipts during the loss year, despite having gross income during each of the preceding five years, increasing each year, and in excess of $1,600,000 just one year earlier (See, Management's income tax returns, Ex. 3, R.357-385) (hereinafter "Ex. 3"); (ii) Management performed services during 2002, apparently charging its affiliates nothing[52]; (iii) Management, despite having no gross income during the loss year, generated more than one million dollars in expenses; (iv) Management deducted $211,206 it claims to have paid its executives for services rendered during the loss year, while failing to charge ICE for those services, and while having no income and no cash from income in order to pay the salaries; and (v) Management claimed on its 2002 bankruptcy schedules that it had no real property nor personal property other than accounts receivable, but it claimed a large deduction for depreciation for 2002, and its bankruptcy schedules suggest that this was for assets that really belonged to the operating companies.

### A.     Management Fees Were Not Accounted For

Management had no gross income during the loss year, despite having gross income during each of the preceding five years and in excess of $1,600,000 just one year earlier (Ex. 3.) This reversed a trend of increasing gross income that had begun in 1996 (essentially to shift income from the operating companies to Management to avoid state taxes).  (Ex. 3.) Management's gross income had exceeded $965,000 for each of the preceding three tax years. (Ex. 3.)  As Mr. Rogers stated, Management's only source of income was the operating companies' payment of management fees.  Thus, the operating companies, under common management with the management company, simply failed to account for the management fee in tax year 2002, that presumably funded the salary payments for the officers.

Management, as an accrual basis taxpayer, is required to report income it earns whether it collects it or not.  If it also determines the obligation to it has become completely uncollectible,

---

[52] The Committee will no doubt invoke the Examiner's testimony that Management mismanaged ICE.  Nevertheless, as indicated in the Statement of Facts above, Management's officers provided extensive services to the operating companies for which the officers were paid only by Management.  (See page 13 *supra*.)

then it may claim a bad debt deduction, but the requirements for such a deduction are stringent. See, 26 U.S.C. § 166(a); 26 C.F.R. §§ 1.166-1, 1.166-2. The absence of income on Management's 2002 tax return simply does not comport with the evidentiary hearing testimony. Mr. Rogers testified that during the carryback years, Management's only source of income was from management fees it charged. (R.284.) Management's gross receipts, which only came from management fees, was reported to be $1,618,147 during the tax year immediately preceding the loss year. (Ex. 3, Form 1120 for tax year ending June 30, 2001, line 1). Mr. Rogers also testified that Management performed services during the loss year. (R.273-275.) Mr. Wentzell, as stated above, similarly testified about services performed for ICE by Management during the loss year. Thus, Management earned a management fee from ICE during the loss year.[53] While Management may have forgiven that debt, the debt amount originally earned was income once Management earned the fees. As such, Management's rights to the fees had vested and became taxable income. Helvering v. Horst, 311 U.S. 112, 115 (1940). Management should have reported income based on earned management fees, which, as stated above, had been more than 1,600,000 one year prior to the loss year.

### B.    Management Failed to Justify Expense Accruals

While generating no gross receipts in the loss year, Management incurred expenses of over one million dollars, (R.300, 349), raising immediate questions as to what it did to justify

---

[53] On cross-examination, Mr. Wentzell provided the following confirmation of the inconsistency in the treatment for the year ended June 30, 2002 (R.301):

> Q. [You] testified as to a number of services [LeBlanc] provided?
> A. Yes.
> Q. Yes?
> A. Yes
> Q. And he provided those services to the operating company?
> A. To all companies – the operating companies, plural, and the management company.
> Q. Despite the services that Mr. LeBlanc purportedly provided to the related entities, there was no management fee charged by the time this amended return was finished, right?
> A. That is correct.
> Q. And despite the fact that there was no management fee charged, Mr. LeBlanc was still compensated for his services that he purportedly provided.
> A. That's correct.

such expense accruals, and in connection with which it accrued no right to any income.

### 1. *The Deduction for Officers' Compensation is Suspect*

Included in the million dollars of expenses is $211,206 for compensation of Management's officers.  (R.300, 349.) Part of the $211,206 of compensation was purportedly paid to David LeBlanc by Management as President of Management.  (R.300.)  Stephen Wentzell testified that Mr. LeBlanc was responsible for operations and field installation for ICE.  (R.294.) Mr. Wentzell also testified that Mr. LeBlanc compiled estimates for ICE, oversaw field operations of ICE, negotiated with ICE's customers, purchased ICE's materials, and negotiated with ICE's suppliers.  (R.294-295.)  Despite this extensive list of purported services performed by Mr. LeBlanc for ICE, Management did not charge ICE for management services provided during the loss year.  (R.301.)  Who was LeBlanc really working for in the performance of the services for ICE?  And, if not Management, then what did he do for Management to justify such compensation?  In fact, as Mr. Wentzell testified, Mr. LeBlanc was President in "title" only and functionally was an operations and field installation employee.  (R.293-295.)  This certainly indicates that Mr. LeBlanc, while paid by Management, thereby generating a deduction from Management's taxable income, was really working for ICE– the operating company.   Additionally, Management, though deducting officer salaries from its 2002 taxable income, could not possibly have paid officers' salaries for that year, unless it received money in 2002 from an affiliated entity.  Management reported no income in 2002, and had no cash on hand at the beginning of fiscal 2002. (R.352 line 1.)  ICE, on the other hand, did have cash on hand at the beginning of the year, (R.322 line 1); it did not, however have cash on hand at the end of the year.  (R.322 line 1.)  As such, either the officers were never paid and the deduction is completely improper, or ICE paid the salaries by using Management as a "conduit," thereby shifting the expense to Management to claim the deduction.  As noted in the statement of facts *supra* (p.13 n.20) the Debtors admitted in their motion to sell assets that Management was "a conduit for the payments of salaries and other benefits to the principals" for the operating

companies.[54]

## 2. *The Deduction for Depreciation is Also Suspect*

Neither ICE nor Management report any real property on their bankruptcy schedules,[55] but Management shows on its bankruptcy schedules accounts receivable of $72,927, and total assets of $72,927 "plus undetermined amount", while it is deducting during the loss year $373,998 for depreciation on the 2002 (loss-year) return. If its only assets with a known value are accounts receivable, what is it depreciating? All of Management's unvalued assets on its bankruptcy schedules are described as trucks or vans– 29 vehicles in all. It is inconceivable that a Management company consisting of two officers, responsible only for the management of operating companies, requires 29 vehicles. The operating companies, responsible for electrical contracting, energy management, and data communications/network installation, in contrast, own no trucks or vans. This is another glaring example of the shifting of expenses to Management in order to create improper deductions.

The questionability of such expense shifting is supported by Mr Wentzell in his examiner's report. In that report, he states that "[k]nown irregularities in [the debtors'] financial

---

[54] What appears to be afoot here is a shell game designed to minimize tax liabilities. Instead of ICE paying LeBlanc for services he provided to ICE, the Debtors arranged to have Management pay LeBlanc, generating useful tax deductions since 1995 (with the deduction for 2002 contributing to the tentative refund), while having ICE satisfy its alleged "obligation" to Management through the payment of fees. For 2002, no fees were charged by Management to pay any officer's salary. Management either deducted in 2002 officer salaries it did not pay, or it must argue that previously unpaid fees owed by ICE to Management were suddenly paid, enabling the payment by Management of LeBlanc's salary. Thus, schedule L to ICE's Form 1120 and Form 1120X for the year ended June 30, 2002, reflects a reduction in payables to affiliates of $340,603, some portion of which was likely owed to Management (as opposed to other affiliates) given the prior relationship and management fees charged by Management to ICE in past years. While Management could use this deduction for salaries to generate a carryback claim for a tentative refund, ICE of course would derive no immediate benefit from deducting the salary of LeBlanc directly, since it had no tax liability in the year ended June 30, 2002, and also had no prior tax payments to claim as refunds based on an NOL. But the reality is that most, if not all, of the deduction for LeBlanc's salary should have been reported on ICE's return, not Management's.

[55] The bankruptcy schedules were not made part of the record on appeal, but are available via PACER. The docket entry number for ICE's schedules is 87 (bankr. case no. 02-45451). The docket entry number for ICE-Conn's schedules is 5 (bankr. case no. 02-45452). The docket entry number for Management's schedules is 5 (bankr. case no. 02-45453).

reporting and revenue recognition don't provide ample comfort that related party transactions were accounted for according to the substance of the transaction." (R.097.) As virtually all of the money applicable to the calculation of the claimed NOL involves related-party transactions,[56] the afore-quoted statement reflects that Mr. Wentzell himself felt that the reported income and deduction amounts, at least beyond the $450,000 deduction that he and Mr. Rogers created, are inherently untrustworthy.

## IV.    THE TAXPAYER FAILED TO MAINTAIN ALL REQUIRED RECORDS AND COMPLY WITH REASONABLE REQUESTS FOR INFORMATION

Even if the Debtors had appeared, and offered evidence, and that evidence was deemed credible, the burden of proof would not shift under § 7491 unless Management substantiated its income and deductions, maintained such records necessary to do so, and complied with reasonable requests for information. 26 U.S.C. § 7491(a)(2). Not a single substantiating document was offered at the evidentiary hearing. Indeed, it appears that the Debtors did not retain any substantiating documents. Debtors' initial disclosures stated that "certain of the Debtors' tax-related documents" were in the custody and control of counsel to the Committee, and Mr. Henry Frye (identified as their "former outside accountant"). (D.188.) When asked, Committee counsel directed government counsel to Mr. Frye (D.239), who disclaimed having any such records (D.400 n.11).

The requirements that records be maintained and provided upon request are not mere surplusage. Those requirements exist as an integral part of a self-reporting tax system, so that the reported information may be verified. Congress was careful to make clear not only that the taxpayer may not shift the burden of proof without strict compliance, but also that "[n]othing in [§ 7491] shall be construed to override any requirement under the [Internal Revenue] Code or regulations to substantiate any item." Additional substantiation requirements are found in 26

---

[56] Management's income comes from its related operating companies, its officer salaries are paid by the operating companies or not at all, and its depreciable assets are held by Management for the operating companies.

U.S.C. § 6001 and its supporting regulations, 26 C.F.R. § 1.6001-1.  The documents required to be maintained by Management include "such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by...in any [tax] return."  26 C.F.R. § 1.6001-1(a).  Without the taxpayer's compliance with sections 6001 and 7491, it is the government, not the taxpayer, that is placed at a disadvantage, as it is the taxpayer that possesses the facts underlying its assertions, while it keeps those facts from the government.

The government made a reasonable request for documentation when it asked the Debtors and the Committee to produce the original 2002 tax return shortly before trial.  Indeed, even without that request, the Committee should have understood that it would need to bring to trial the original tax return for the very tax year for which the claimed NOL was being challenged.[57] The requested return was said to be in the custody of the Debtors' prior accountant, Mr. Frye, who said that he did not have any records.  (R.239, 400 n.11.)

The government also intended to examine all of the required documentation at trial, and had an internal revenue agent available to do so.  (R.236.)  No substantiating documentation was made available, presumably either because the Committee did not have any or because it chose deliberately not to bring them.[58]

## V.    THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN DENYING THE IRS A 30-DAY CONTINUANCE AFTER THE PROVISION OF 111 DAYS COMBINED FOR AN IRS EXAMINATION AND DEPARTMENT OF JUSTICE TRIAL PREPARATION

Outside bankruptcy, the IRS would normally have three years to audit a loss-year return that, by reason of an application for a tentative carryback under I.R.C. § 6411, had resulted in a

---

[57] The impact of this concealment of information is demonstrated by the bankruptcy court's misunderstanding as to the nature of the $450,000 management fee expense.  If the original 2002 tax return had been made available, the court would have seen clearly that Management's 2002 gross income was zero both before and after the amendment.  If shown that clearly, the court would have known that the "reversal" of management fees was really the "reversal" of fees paid before fiscal 2002, and not merely the reversal of 2002 income previously reported.

[58] In its pre-hearing memorandum, the Committee stated that it did not intend to present any documents or other exhibits in its case-in-chief.  (R.198.)

tentative refund.  When the government attorney informed the bankruptcy court of this, the court responded: "You know, don't -- that's fine.  This is a bankruptcy.  There's a lot of things that happen outside the normal course, and the government well knows that."  (R.242.)  We do not dispute that corporate reorganizations sometimes depend upon resolving liabilities with much greater dispatch.

But the Bankruptcy Code provides a benchmark for what Congress expected would be a reasonable period for an administrative tax proceeding with respect to tax returns filed post-petition in bankruptcy cases.  Thus, § 505(b) of the Bankruptcy Code provides deadlines to govern the circumstances under which the trustee, debtor, and any successor to the debtor may be discharged from a liability for a tax that is incurred by the estate if the trustee (which includes a debtor in possession, provided in B.C. § 1107) files a request with the IRS for an expedited examination of a tax return.  First, the IRS has 60 days to survey the return and determine whether it wishes to conduct an examination.  B.C. § 505(b)(1)(A).  If it notifies the debtor of an examination, it has another 120 days to complete the examination.  11 U.S.C. § 505(b)(1)(B).  Only if the IRS then determines a liability does a judicial proceeding in the bankruptcy court even begin, at which point the Department of Justice would become involved and would have a right to conduct discovery under the Federal Rules of Civil Procedure.[59]  See 11 U.S.C. § 505(b)(2) (indicating that judicial proceeding does not begin until "after completion by such governmental unit of such examination"); In re Indian Motocycle Co., 261 B.R. 800 (1st Cir. BAP 2001) (holding that § 505(b) is the proper way for a trustee to force the IRS to determine its position with respect to a tax return, and reversing the bankruptcy court's "capping" of the tax claim where § 505(b) was not followed).

Section 505(b) applies only to liabilities of the estate ("any unpaid liability of the estate for any tax incurred during administration").  That usually means tax returns for postpetition periods.  But postpetition applications for tentative refunds result in liabilities of the estate when

---

[59] A § 505(b)(2) judicial proceeding is a "contested matter" under Rule 9014, which makes applicable Rules 7026-37 (i.e. Fed.R.Civ.P. 26-37).

the IRS audits the loss-year return, whether the loss year ends pre- or post-petition.[60]  Accord-

ingly, the Debtors in this case could have submitted the amended 2002-year return and tentative

refund application with a § 505(b) request, and could also have filed a § 505(b) request at any

time thereafter, such as when the refund was received.  No such request was filed by the Debtors

in this case.

Instead, the Debtors, having no stake in the outcome, and no real need for a rush because

their assets had all been sold and no reorganization was being attempted, not only objected to the

protective tax claim, but also asked the Court to require the IRS to complete an audit in 30 days.

At a hearing on July 31, 2003, on that motion to expedite, the bank and Creditors Committee –

the instigators of the Debtor's objection and procedural tactic of seeking to rush the IRS despite

the absence of any objective need for a rush – urged the bankruptcy court to compel the IRS to

complete an audit in 60 days and then hold trial only 30 days later.[61]  The government requested

90 days for the IRS to conduct an administrative examination.  (Setting a trial could await the

outcome of the administrative investigation.  Cf. 11 U.S.C. § 505(b)(2).)  After all, unless the

IRS determined to assert a deficiency, there was no ripe controversy – the IRS made it clear that

its claim was filed only to protect against a default in view of the administrative claims bar date.

The time requested by the IRS was half the time that is permitted for such an administrative

examination, prior to any litigation in the court, had the Debtor submitted a § 505(b) request with

the amended 2002-year tax return and application for a tentative refund.  The bankruptcy court

set an evidentiary hearing for November 19, 2003 – 111 days after the July 31 hearing – for the

administrative examination and trial preparation, combined.

Admittedly, the IRS failed to begin the examination until immediately before the

evidentiary hearing, due apparently to miscommunications within the agency regarding the need

---

[60] Under I.R.C. § 6411, a postpetition application for a carryback creates a tax incurred during
administration, since it is the issuance of the excessive refund that generates the debt, as opposed
to some prepetition failure to pay, as confirmed by B.C. § 503(b)(1)(B)(ii).

[61] The condition in the settlement between the bank and the Creditors Committee that the
settlement would fall apart if the IRS claim was not resolved with undue haste was of course
completely artificial.  The estate was already fully liquidated.

to complete the examination expeditiously.  Nevertheless, when the Department of Justice finally realized this, it quickly determined that the loss-year return revealed a number of highly suspect entries.  So the Department determined to defend the proof of claim, with the examination having barely begun, and requested a 30-day continuance of the trial date.

The Department informed the Creditors Committee that the committee would have the burden of proof, and suggested that more time be allowed for exchange of relevant information and to prepare for the evidentiary hearing.  The Department did not seek discovery earlier because it assumed, mistakenly, that the IRS was conducting an administrative examination. While we have acknowledged the government's shortcomings in this regard, nevertheless, we submit that the United States should have been afforded an extension for the Department of Justice to take discovery, even without an IRS examination, once the Department of Justice determined that the return contained highly suspect entries.  Section 505(b) suggests that even in bankruptcy cases, absent some genuine emergency (*i.e.*, not one artificially created by an arbitrary deadline imposed on the debtor in a settlement offer by a competing creditor seeking a cash fund that is earning interest), the IRS should have six months for its administrative determination, only after which a contested matter, with all the pretrial rules, should first commence.

At the evidentiary hearing, the bankruptcy court commented that if "somebody had asked" the court to do so, it would have considered defaulting the United States.  In fact, by effectively excusing the debtor from meeting I.R.C. § 7491's conditions for shifting the burden of proof to the government, because the government supposedly "ambushed" the Creditors Committee, the bankruptcy court did, as a practical matter, default the United States.  Such a default is contrary to Congressional intent.  As noted in part II-C above (p.33), the act which added § 7491 to the tax code provided that it would apply in cases in which there was no administrative examination.   See P.L. 105-206, § 3001(c).  See also Fed.R.Civ.P. 55(e) (applicable under Bankruptcy Rules 7055 and 9014).

The bankruptcy court based its decision on its perception that the Debtors had offered

credible evidence, and that the United States had no evidence to offer due to "dilatory . . . tactics" (R.416), and found it inequitable to require the Committee to substantiate items because the government had used "'ambush' tactics" (R.415 n.7). But there is not a whit of evidence in the record to suggest that these were "tactics" at all, or that there was an "ambush" – words that clearly denote a conscious choice. The bankruptcy judge was understandably frustrated with the government, but ascribing bad faith, in the absence of any evidence of it, goes to far.[62] All that happened was that the IRS did not act as quickly as, in hindsight, we wish it would have. The Department tried repeatedly to warn the Debtors and the Creditors Committee that they had the burden of proof, and offered to identify specific areas of concern if given 30 more days. Even after the evidentiary hearing, the government again suggested that the record be kept open for both sides to supplement it.

In the end, the government's errors were not so egregious as to justify practically defaulting it by denying it discovery (which it had not yet taken on the assumption the IRS was investigating) and then shifting the burden of proof to the IRS despite the clear failure of the taxpayer to meet the conditions for such shifting. Perhaps most importantly, given that tax manipulation appears to have been a regular practice among the three Debtors, the equities in this case do not favor relieving the taxpayer of meeting the requirements in § 7491 for shifting the burden of proof to the government.

At all events, regardless of who ultimately has the burden of proof, the $450,000 "management fee expense" deduction that appears to have been concocted and certainly was not fixed and determinable during the loss year, must be disallowed.

### Conclusion

The application for tentative refund in this case had to be processed in 90 days and, since it revealed no computational errors or material omissions, was required by statute to be granted. On receiving notice of the claims bar date, the IRS had to file a protective request for payment to

---

[62] Moreover, such language, when not warranted, only serves to encourage similar unsubstantiated accusations by litigants in a system that some courts have recognized could use an infusion of civility.

preserve its ability to audit the loss-year return and recover the tentative refund if it was not justified. At the insistence of the bank and Creditors Committee, the court severely truncated the IRS's time to investigate and set a trial without awaiting the examination's conclusion. Because the Committee mistakenly insisted that the burden of proof was on the government, the Committee failed to bring to trial witnesses with personal knowledge sufficient to adduce credible evidence in support of the claimed NOL that generated the tentative refund. With respect to the one issue on which it introduced credible evidence -- the $450,000 management fee expense -- the Committee succeeded only in proving that the deduction was wholly improper.

The bankruptcy court erred in finding the $450,000 deduction to reflect a reversal of unrealized income reported for the year, since all of the evidence demonstrated that no income was reported for the year, and instead the $450,000 was the alleged accrual of a liability in the nature of a tort or breach of contract for mismanagement, which was not fixed until the following tax year (2003), and which became unenforceable before it was fixed. The bankruptcy court also erred in shifting the burden of proof to the government with respect to any other item. The bankruptcy court also abused its discretion in denying the government's request for a 30-day continuance of the trial.

This Court should reverse the judgment of the bankruptcy court and remand with instructions to enter judgment in favor of the United States. At a minimum, it should vacate the judgment and remand with instructions to disallow the $450,000 management fee expense

deduction, and allow the government take additional discovery on other issues, prior to retrying them.

                                        Respectfully submitted,


                                         /s/Barry E. Reiferson
                                        BARRY E. REIFERSON
                                        PETER SKLAREW
                                        Attorneys, Tax Division
                                        U.S. Department of Justice
                                        Post Office Box 55
                                        Ben Franklin Station
                                        Washington, D.C.  20044
                                        Telephone: (202) 514-6058

*Local Counsel:*

MICHAEL J. SULLIVAN
United States Attorney


CERTIFICATE OF SERVICE

        I hereby certify that a true copy of the above document was served upon counsel for the Official Committee of Unsecured Creditors; Industrial Commercial Electrical, Inc.; I.C.E.-Conn, Inc.; and I.C.E. Management; and upon the U.S. Trustee, by mail on April 6, 2004.

/s/Barry E. Reiferson
Barry E. Reiferson