UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| In re:<br><br>INDUSTRIAL COMMERCIAL<br>ELECTRIAL, INC. et al.,<br><br>　　　　Debtors.<br><br>UNITED STATES OF AMERICA<br>(INTERNAL REVENUE SERVICE)<br><br>　　　　Appellant,<br><br>　　v.<br><br>OFFICIAL COMMITTED OF<br>UNSECURED CREDITORS of<br>I.C.E. Management, Inc.<br><br>　　　　Appellee. | Case No.: 4:04-cv-40038-WGY<br><br>*On appeal from the order of<br>the Bankruptcy Court,<br>Case No. 02-45451-JBR* |

### APPELLANT'S REPLY BRIEF

　　　　　　　　　　　　　　　　　　　　BARRY E. REIFERSON
　　　　　　　　　　　　　　　　　　　　PETER SKLAREW
　　　　　　　　　　　　　　　　　　　　Attorneys, Tax Division
　　　　　　　　　　　　　　　　　　　　U.S. Department of Justice
　　　　　　　　　　　　　　　　　　　　Post Office Box 55
　　　　　　　　　　　　　　　　　　　　Ben Franklin Station
　　　　　　　　　　　　　　　　　　　　Washington, D.C.  20044
　　　　　　　　　　　　　　　　　　　　Telephone: (202) 514-6058

*Local Counsel:*

MICHAEL J. SULLIVAN
United States Attorney

# TABLE OF CONTENTS

**Preliminary Note on Caption, Standing, and Who is the "Taxpayer"** .................. 1

I.   **The Appellee's Brief Untenably Argues that this Court Should Simply Ignore the Merits, Despite the Brief's Admission that the $450,000 "Management Fees Expense" Was Really an Unliquidated Liability for Previous-Year Overcharges, and that the Bankruptcy Court Thus Erred** ................................. 2

II.  **The Answer Brief's Suggestion that the Court Ignore the Facts of Record Pertaining to the Other Questionable Items on the Tax Return is Equally Untenable** ......................................................... 6

III. **The Answer Brief's Procedural Arguments Rely on Distortions of the Government's Positions and Otherwise Simply Miss the Mark** .................. 9

   A.   *The Committee's Argument That the Substantiation Requirements Do Not Apply Absent an IRS Examination, Is Belied by Statute, and that Statute is Supported by Sound Policy Considerations* ............................. 9

   B.   *The 180 Days for an IRS Administrative Examination in § 505(b) Does Not Begin Without a Request Placing the IRS on Notice of the Need to Rush* ... 12

   C.   *The Government Did Not Voluntarily Propose the Discovery Schedule, and the Implication that it Failed to Cooperate in Discovery is Outrageous* ..... 13

**Conclusion** ..................................................................... 16

# TABLE OF AUTHORITIES

**Cases:**

In re E.R. Fegert, Inc., 887 F.2d 955 (9th Cir. 1989) .................................... 4

In re Indian Palms Associates Ltd., 61 F.3d 197 (3d Cir. 1995) ......................... 3, 4

In re Missionary Baptist Foundation of America, 712 F.2d 206 (5th Cir. 1983) ............. 4

Interex, Inc. v. Commissioner, 321 F.3d 55 (1st Cir. 2003) ............................... 9

**Statutes:**

11 U.S.C. § 1107 ..................................................................... 1

11 U.S.C. § 1109(b) .................................................................. 1

11 U.S.C. § 323 ...................................................................... 1

11 U.S.C. § 505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

26 U.S.C. § 6213 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 6411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

26 U.S.C. § 6511 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

26 U.S.C. § 6532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

26 U.S.C. § 6871 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 7430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

26 U.S.C. § 7491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 10, 11, 14

§ 3001(c) of the IRS Restructuring and Reform Act of 1998 (P.L. 105-206) . . . . . . . . . . . . . . . 10

## **APPELLANT'S REPLY BRIEF**

The United States continues using the abbreviations and record citation forms defined in its opening brief.

**Preliminary Note on Caption, Standing, and Who is the "Taxpayer"**

Preliminarily, the "Brief of the Appellee" has prompted us to alter the caption to designate the Creditors Committee as the appellee (and only appellee) in this appeal. The body of the brief admits that it is filed on behalf of the Creditors Committee and also purports to knock down an imaginary argument that the Creditors Committee lacks standing. (Ans.Br. at 14 n.3.) But the government's opening brief acknowledged that the Committee, at least on behalf of its counsel, has standing since the IRS's recovery of the erroneous tentative refund will eliminate a source of funds to distribute in payment of an administrative claim for professional fees by counsel to the Committee.

The answer brief's standing footnote, however, misses completely the point of the government's argument that I.R.C. § 7491 applies only to the "taxpayer."[1] The Committee is not the "taxpayer" in this case, and, although it is a "party in interest" with the right "to be heard" under B.C. § 1109(b), the Committee errs fundamentally in suggesting it may "advocate the interests of the Debtor's estate." Section 323 of the Bankruptcy Code specifies that the trustee "is the representative of the estate" in a case under title 11 and § 1107 specifies that a debtor in possession has the rights and duties of a trustee when the case is under Chapter 11. See also Fed.R.Bankr.P. 6009.

The Committee in fact compounds its error by inserting at the end of its brief a frivolous request for attorney fees under I.R.C. § 7430, the examination of which adds significant support to the government's argument that I.R.C. § 7491 is inapplicable where the United States is litigating against a competing creditor of the taxpayer and not against the taxpayer. Section 7430

---

[1] While this point about who is the "taxpayer" under I.R.C. § 7491 is best made preliminarily in this reply, we stress again that the core of this appeal is about the *merits* of whether the three main tax deductions on Management's 2002-year return, and the lack of income, generating a $1 million NOL, are sustainable on this record, even if § 7491 does apply to the Committee.

1

demonstrates that Congress knows how to extend rights, in litigation with the government, to persons other than taxpayers. Thus, § 7430 includes, in the class of persons who may qualify as the "prevailing party" entitled to a fees award, "any party in any proceeding to which subsection (a) applies (other than the United States or any creditor of the taxpayer involved)." See 26 U.S.C. 7430(c)(4)(A). Moreover, one of the "limitations" listed in § 7491, necessary for burden-shifting, is that, "in the case of a partnership, corporation, or trust, the taxpayer is described in § 7430(c)(4)(A)(ii)." Given that § 7430(c)(4)(A) is not limited to taxpayers but excludes competing creditors, and § 7491 applies only to a "taxpayer" described in § 7430(c)(4)(A)(ii), it is untenable to argue that § 7491 applies to competing creditors.[2]

Since the Committee has offered no sound reason for reading the word "taxpayer" out of § 7491, it follows that the burden-shifting provision applies only when it is the taxpayer that is litigating against the government. In this case, where the fight is between the IRS and a competing creditor of the taxpayer (a creditor that admittedly has standing to litigate), the burden-shifting provision is simply inapplicable and the burden remains where it has historically been – on the government's adversary.

I.  **The Appellee's Brief Untenably Argues that this Court Should Simply Ignore the Merits, Despite the Brief's Admission that the $450,000 "Management Fees Expense" Was Really an Unliquidated Liability for Previous-Year Overcharges, and that the Bankruptcy Court Thus Erred**

In our opening brief, we stressed that, notwithstanding arguments about procedure and shifting the burden of proof, "our contentions with respect to the merits should be viewed as being at the core of this appeal"; that "the record demonstrates affirmatively that the bankruptcy court completely misunderstood the undisputed testimony and documentary evidence regarding the one tax deduction its opinion addresses (the $450,000 'management fee expense'), and thus erred in allowing that deduction"; and that with respect to the deductions for depreciation and

---

[2] Notably, the exclusion of competing creditors from § 7430 means that Congress determined they should bear their own litigation expenses *even when the litigation position of the United States is not "substantially justified."* 26 U.S.C. § 7430(c)(4)(B). There is no reason to expand the word "taxpayer" in burden-shifting provision, § 7491, to this disfavored class of litigants. (Needless to say, the United States objects to any award under § 7430.)

2

officers' salaries, "the problem is not merely lack of substantiation" but rather that the Committee failed to introduce any evidence to support these deductions, while the tax returns on their face contain other information (including but not limited to the lack of income) that makes these deductions highly suspect.

The Committee's sole response to the opening brief's extensive presentation of facts and law in support of the foregoing contentions with respect to the merits is a single prefatory footnote insisting that the Committee need not address them, because they reflect an improper effort to "supplement the record" by "incorporat[ing] an examination into [the government's] brief," and by "argument not presented for review by the court below." (Ans.Br. 2 n.1.) First of all, every one of the merits-based arguments made in our opening appeal brief was advanced at least briefly in our post-trial memorandum filed with the Bankruptcy Court, before it reached its decision. Secondly, the was no post-trial IRS examination. All that occurred was that the undersigned and his immediate supervisor reviewed the testimony and exhibits introduced by the Committee at trial, and applied the law to the facts thus indicated.

In that regard, every single fact cited in our opening brief was derived from the record before the Bankruptcy Court. It is true that we asked this Court to take judicial notice of two documents in the main bankruptcy case that were not re-introduced in the particular "contested matter" (the tax claim objection proceeding), but appellate courts in bankruptcy cases routinely take judicial notice of such items for facts that are obviously undisputed background facts regarding the underlying bankruptcy case.[3] In In re Indian Palms Associates Ltd., 61 F.3d 197 (3d Cir. 1995), the court of appeals endorsed the district court's refusal to strike items filed in other proceedings within the larger bankruptcy case because judicial notice, which applies only to adjudicative facts "not subject to reasonable dispute," Fed.R.Evid. 201(b), "may be taken at

---

[3] The opening brief asked this Court to take judicial notice of two items on file with the Bankruptcy Court, but not in the tax claim objection contested matter – both for secondary and non-crucial facts – as follows: (1) a motion to sell assets, filed by the Debtors (and supported by the Creditors Committee) (see Op.Br. at 13 n.19); and (2) the Debtors' own bankruptcy schedules, filed incident to their bankruptcy petitions (ibid. at 13-14 n.20). There is no dispute that these items were filed or as to what they say.

3

any stage of the proceeding, Fed.R.Evid. 201(f), including appeal . . . as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." 61 F.3d at 205. And, in In re E.R. Fegert, Inc., 887 F.2d 955, 957-58 (9th Cir. 1989), the court, in upholding the district court's judicial notice of additional items in the main bankruptcy case, reasoned that the record in an adversary proceeding relies upon the file in the underlying bankruptcy case. Indeed, a bankruptcy judge would likely find it almost impossible to ignore related proceedings that had occurred before him in the same case. Thus, in the instant case, the Bankruptcy Court's opinion discusses several aspects of the procedural history of the bankruptcy case that were not fully elucidated by evidence introduced at the trial in the tax claim objection proceeding. Moreover, the Creditor's Committee is hypocritical because it designated for inclusion in the appeal record the Examiner's Report on file in the main case, notwithstanding that it did not introduce that report as a trial exhibit. See also In re Missionary Baptist Foundation of America, 712 F.2d 206, 211 (5th Cir. 1983).

What is more important is that the Answer Brief several times admits that the $450,000 "management fees expense" was really not a reversal of income reported on the original 2002-year return as the Bankruptcy Court found, but rather was an unliquidated liability for previous-year mismanagement and/or alleged overcharges. Yet the Committee asks this Court to ignore this clearly erroneous finding of fact by the Bankruptcy Court in determining whether, as a matter of law, the $450,000 is deductible on Management's 2002 tax return. The admission is indicated on pages 6 and 23 of the Answer Brief. First, it states (p.6) that the Examiner "determined that a reversal of certain management fees *previously* charged to ICE by Management *in prior fiscal years* may be appropriate." (Emphasis added.) Then, it states (p.23) that "Mr. Rogers concluded that . . . in his professional opinion, Management had not earned $450,000 of the management fees it had *previously* charged ICE." (Emphasis added.)

Putting aside for the moment that Committee counsel never asked the trial judge to accept either witness as an expert of any kind, let alone as valuation appraisers of services rendered, the Answer Brief's factual admissions compel, as a matter of law, the disallowance of

4

the $450,000 deduction, at least in the 2002 tax year. First, calling it a "reversal" of fees charged and collected in prior years is a misnomer. While it is arguably possible to "reverse," reported items of accrued income that were never actually received, it is not possible to "reverse" payments actually received in prior years by simply reporting them as an "expense" in a subsequent year. The testimony of the witnesses was uniform to the effect that the $450,000 charge was the result of a determination that Management was liable, due to mismanagement and/or overcharges, to pay ICE back part of the money ICE paid to Management in prior years. This is why they also amended ICE's return for 2002 to report the $450,000 as an asset in the form of an account receivable from Management. As our opening brief demonstrates, however, such a transaction, to be deductible for tax purposes, requires that the amount of the liability be fixed and determinable before the end of the tax year. Here, the thought of imposing a mismanagement or overcharges liability on Management – which witness Rogers admitted was fixed solely by reference to his personal opinion in December of 2002 as to what would be a reasonable adjustment amount – was not even a gleam in anyone's eye when the tax year ended on June 30, 2002. Further, since Management was in bankruptcy, such a liability could not be asserted unless a timely claim was filed by ICE in Management's case, and therein allowed by the Bankruptcy Court. No claim – let alone a timely claim – was ever filed.

      In this regard, footnote 4 on page 14 of the Answer Brief misses the point in arguing that the Examiner was "authorized to make these adjustments" on tax returns. We did not remotely argue that the Examiner was not authorized to oversee the filing of tax returns and to make any adjustments to income or expense necessary to properly reflect income under the Internal Revenue Code. What we argued is that the Examiner was not authorized to assert a secret claim on behalf of one company against another for mismanagement, without telling the court, and then ask an accountant to determine the amount of the claim. To the extent the witnesses were experts (even though they were not introduced at trial as such), their qualifications were as accountants. Accountants "account" for transactions that have occurred; they don't dream up brand new transactions – such as the settlement of a claim sounding in tort or for breach of

5

contract – that their clients had not even contemplated during the tax year for which they are accounting.

Similarly off the mark is the Answer Brief's implication (pp. 12-13) that we seek to attack the credibility of the Committee's witnesses. We have not remotely suggested that the witnesses did not tell the truth. We do contend that their testimony does not make sense, or reflects unproven factual assumptions and incorrect legal assumptions.

The foundational premise for Mr. Rogers's estimate of Management's liability to ICE also does not withstand scrutiny. As the Answer Brief explains it, "Mr Rogers also testified that the Examiner informed him [hearsay] that Management historically [double hearsay] charged ICE a management fee each year that was predicated on the success of ICE during any fiscal year." (Ans.Br. at 22.) But it is beyond dispute that, before Mr. Rogers unilaterally determined to impose a $450,000 mismanagement liability on Management, the *original* 2002-year return reflects that Management charged ICE *zero* fees for the entire year, notwithstanding having performed substantial services (attested to by the witnesses and described in our opening brief). Indeed, Management paid all of the officers' salaries even though, according to the witnesses' testimony, the officers spent much of their time providing services directly to the operating companies. Thus, Management already performed services for ICE for free throughout the 2002 tax year, which either means that the lack of success was already accounted for, or the entire premise was a false assumption.

Given the factual admissions on pages 6 and 23 of the Answer Brief, confirming that the Bankruptcy Court's most crucial fact finding – indeed, the sole fact finding in the entire opinion that pertains to the merits of the tax deductions at issue – is clearly erroneous, this Court must reverse the allowance of the $450,000 "management fees expense" deduction.

II.     **The Answer Brief's Suggestion that the Court Ignore the Facts of Record Pertaining to the Other Questionable Items on the Tax Return is Equally Untenable**

Consistent with the position in footnote 1 of the Answer Brief, the Committee simply refuses to address the government's demonstration, relying strictly on the record before the Bankruptcy Court, that the other two major deductions – depreciation and officers' salaries – are

6

not supported by any evidence (credible or not), and impossible to reconcile with zero income for the tax year. Our opening brief demonstrates that depreciable assets, used by the operating entities in the their business operations, were originally depreciated on the operating companies' tax returns and later apparently transferred, at least on paper, to Management, solely because Management could use the tax deductions to shelter income when the operating companies had no income in need of sheltering. The assets depreciated on Management's returns continued to be used by the operating entities, and no rent was paid to Management for their use. In short, the Debtors appear to have long employed a shell game for tax manipulation purposes.

Similarly, the salaries in 2002 were deducted on Management's returns, even though the officers actually worked as much, if not more, for the operating entities. And despite all the work that the officers, paid only by Management, performed for the operating companies, Management charged the operating companies no management fees in 2002. Coincidentally, that was the first year in which the operating companies did not need to pay management fees to eliminate taxable income of their own.

The Committee vaguely suggests that the tax return entries on issues besides the management fees expense should be viewed as credible evidence because the Examiner had previously reviewed the Debtor's books and records. Presumably this argument is based on the principle that experts can rely on hearsay to offer opinions. First, the witnesses were not introduced as experts; they testified as fact witnesses. Moreover, at no time was the Examiner asked to render an expert opinion on whether the deductions for depreciation and salaries were proper based on his review of the Debtors' books and records. If he had been asked such a question, the United States would have objected because, even assuming the Examiner was an expert in tax law (which is highly doubtful and certainly was not demonstrated at trial), it would not be proper to admit expert legal opinion on the ultimate legal issues to be decided.[4]

---

[4] In fact, when, at one point, the Examiner was asked whether he had come to a legal conclusion with respect to taxes that the Debtors had paid, government counsel did object and the objection was sustained. (R.248-49.) While the court left open some possibility of Committee counsel laying a foundation for such testimony (ibid.), none was laid and the question was not repeated.

7

Furthermore, experts may rely on hearsay to offer opinions but that does not mean their opinions may be offered to prove the truth of the hearsay on which those opinions rely where there is no admissible evidence to support the facts alleged.

At all events, the argument completely misses the point because whether the Debtor's books and records reflect the depreciation or the payment of salaries claimed is irrelevant. Instead, we demonstrated that the placement of the officers' salary expense on Management's books (assuming that is the case) was a facade motivated by the determination to shift to Management tax deductions properly allocable to the operating companies. That is because the undisputed facts show that the operating companies incurred, and apparently paid, the salary expenses. Similarly, we pointed out that placing the depreciable assets in the name of Management (assuming formalities were followed) was a ruse, designed to create tax deductions, when the assets were really owned by the operating companies. Alternatively, if the assets were really owned by Management, then it is necessary and appropriate to impute rental income to Management, based on the inter-company transactions. Finally, the opening brief pointed out that the Examiner's own report to the Bankruptcy Court stated that the inter-company transactions as reported on the companies' books and records were unreliable and often not reflective of the real substance of the transactions reported. Given that admission, it is untenable for the Appellee now to argue that the Examiner could rely on his prior review of the companies' books and records in order to validate the entries on the tax returns. At all events, he never testified to the correctness of any entry on the original tax return for 2002; to the contrary, both witnesses called to the stand by the Committee admitted they lacked personal knowledge of the facts underlying those entries.[5]

---

[5] It is most disingenuous for the Answer Brief to assert (p.23) that the government, in its cross-examination of the Committee's witnesses, "did not explore" particular aspects of the returns to establish that they were invalid. Both witnesses repeatedly admitted having no knowledge of the basis for any of the entries on the tax returns with the sole exception of the $450,000 management fees expense that they added when amending the original 2002-year return. Accordingly, it would have done nothing but waste the Bankruptcy Court's time for government counsel, after eliciting this lack of knowledge, to question the witnesses about every line on the amended return.

In that regard, the Interex case discussed on page 26 of the Answer Brief supports the government's arguments, not the Committee's. In Interex, Inc. v. Commissioner, 321 F.3d 55 (1st Cir. 2003), the First Circuit affirmed the Tax Court's determination that the taxpayer failed to present credible evidence sufficient to shift the burden of proof with respect to the deduction for professional fees because the taxpayer had never been invoiced by the professional, and the taxpayer's representative who testified at trial was not personally aware of the services purportedly performed by the professional. In fact, the court found there was no evidence to support the reported deduction. That is the same situation here (1) where the witnesses had no knowledge of the underlying transactions, (2) where the depreciation deduction on Management's return for assets used by the operating companies is inconsistent with the lack of rental income charged to those companies, (3) where there was no evidence explaining how the officers' salaries were paid or why the officers were not viewed as working for the operating companies, and (4) where ICE did not file a claim for the purported "management fees expense" deduction on Management's tax return and the corresponding account receivable on ICE's tax return. Interex further supports the government's potion in this case that the management fees expense could not be deducted on the 2002-year return because it was not fixed and determinable during that period. The First Circuit held that the taxpayer was not even aware of the liability for professional fees during the year, and thus could not have deducted them in that year. 321 F.3d at 59-60.

### III.    The Answer Brief's Procedural Arguments Rely on Distortions of the Government's Positions and Otherwise Simply Miss the Mark

Even as to the procedural arguments that are its focus, the Answer Brief relies on substantial distortions of some of the government's arguments, while other times simply missing the mark completely.

#### A.    *The Committee's Argument That the Substantiation Requirements Do Not Apply Absent an IRS Examination, Is Belied by Statute, and that Statute is Supported by Sound Policy Considerations*

The Answer Brief spends five pages (16-20) arguing that the Committee was simply not required to substantiate the tax deductions claimed by the Debtor because the IRS did not

conduct an examination (or make an assessment). The Committee, without mustering any legislative history, postulates that § 7491 reflects the "clear intent of Congress that the IRS no longer be permitted to appear in court empty handed, without having conducted an investigation of its claims." This attempts to turn a simple burden-shifting provision into a default provision. Congress understood the difference, and in fact its intent was clearly just the opposite of that postulated by the Committee.

As noted in our opening brief, § 3001(c) of the Internal Revenue Service Restructuring and Reform Act of 1998 (P.L. 105-206) provides that new § 7491 applies to examinations after July 22, 1998, and "[i]n any case in which there is no examination, [§ 7491] shall apply to court proceedings arising in connection with taxable periods or events beginning or occurring after such date of enactment." P.L. 105-206, § 3001(c)(2). Thus, Congress explicitly recognized that there might be judicial proceedings without an IRS examination.

In this regard, the ability of the Department of Justice to elect to defend at trial a protective claim filed in a bankruptcy case is especially important in cases of tentative refunds under I.R.C. § 6411 that are claimed by Chapter 11 bankruptcy debtors. Section 6411 does not permit the IRS any leeway to deny a tentative refund where there are no computational errors; it must issue the tentative refund in 90 days. The general theory was that the IRS could get the tentative refund back after an audit of the loss year return if it turned out that the taxpayer had not in fact made an overpayment. In bankruptcy cases, however, that may not be possible after a claims bar date. This fact, and the fact that the IRS must grant the tentative refund essentially without being able to question it, have not escaped the attention of bankruptcy practitioners (accountants as well as attorneys) involved in Chapter 11 cases. As a practical matter, therefore, the IRS is quite frequently forced to file protective administrative claims to recover tentative refunds issued during the early stages of Chapter 11 proceedings. And, it is a fact that the agency does not have limitless resources. As a result, the ability of the Department of Justice to determine, after looking over the tax return claiming the NOL that resulted in a tentative refund, along with any readily available information bearing thereon, to choose to defend the protective

claim filed by the IRS, is sometimes a last line of defense against overly aggressive tax deductions by debtors hoping for a quick infusion of cash to help a reorganization (and perhaps figuring that even if the IRS claims the money back, the Debtor will have forced it to make an involuntary loan).

In this regard, a tentative refund is called a tentative refund because the taxpayer has not yet established an "overpayment" (*i.e.* a payment in excess of the true tax), subject to a non-tentative refund claim under I.R.C. § 6511. It is therefore appropriate to consider the procedural rules that would apply if a trustee or debtor claimed a refund and then commenced a refund suit under B.C. § 505(a)(2). That provision's specification that an action may be commenced *either* 120 days after filing an administrative claim for refund, or after the claim is denied, confirms that Congress understood that there will be plenty of cases in which the IRS simply does not act on a refund claim within 120 days. The same occurs routinely in ordinary district court refund suits (unrelated to bankruptcy) where the jurisdictional prerequisite is waiting for six months after filing an administrative claim for refund unless the IRS denies the claim sooner. 26 U.S.C. § 6532. No court has ever held, to our knowledge, that the mere failure of the IRS to process a claim for refund before litigation means that the Department of Justice is not permitted to defend. To be sure, discovery is generally taken, but it is not mandated.[6] Under § 7491, the taxpayer must still introduce credible evidence on all material issues to shift the burden of proof to the government.

But it does not follow from the government's right to defend the tax claim, despite the absence of an IRS examination, that the IRS expected the Committee to bring five years of records to trial, as suggested on page 15 of the Answer Brief. In fact, all that was necessary was for the Committee to address the three deductions in 2002 that make up the bulk of the $1 million in claimed expenses (management fees expense, depreciation, and officers' compensation), and the seemingly inconsistent complete lack of income for that year.

---

[6] The automatic disclosure rules are of relatively recent vintage and, in the situation described, the government may often have nothing to disclose at the outset as the taxpayer is in control of all the relevant data.

### B. The 180 Days for an IRS Administrative Examination in § 505(b) Does Not Begin Without a Request Placing the IRS on Notice of the Need to Rush

The Committee repeatedly implies that the IRS was not prejudiced by the schedule set by the Bankruptcy Court because the amended return claiming the loss carryback was filed in December of 2002. (E.g., Ans.Br. at 29-30.) In this connection, the Answer Brief argues that "both the Bankruptcy Code and the Internal Revenue Code anticipate the expediency of bankruptcy proceedings," citing B.C. § 505 as "(proscribing [sic] abbreviated review and examination periods for filings by bankrupt taxpayer)" and I.R.C. § 6871 as "(requiring immediate assessment of taxes in bankruptcy and insolvency proceedings)." (Ibid.) While the parenthetical correctly describes § 505(b) (which cannot be said for the parenthetical describing I.R.C. § 6871),[7] the Committee is mistaken in believing that the expedited examination period began when the amended tax return was filed.

As noted in our opening brief, the Debtor failed to file, with either the amended or the original 2002 return (also filed postpetition), a request for expedited audit as required by § 505(b). Such a request is essential to place the IRS on notice that the § 505(b) periods have been triggered. Otherwise upon receipt of a return, the Service Center, which generally has no notice of a bankruptcy case, will assume that it has the usual three years to conduct an administrative examination. Notice of the initial bankruptcy filing is sent to a different IRS office, which is responsible for filing claims and monitoring the case. In the instant case, the first time that the IRS had notice that the Debtor's sought to impose a deadline for an IRS examination to be completed is when the IRS was served with the claim objection and request to limit the examination to 30 days.

---

[7] The notion that I.R.C. § 6871 requires immediate assessment of all taxes claimed in a bankruptcy case is simply wrong. Section 6871(a) allows immediate assessment for taxes owed by taxpayers placed into receivership. In contrast, § 6871(b) applies to title 11 cases, and provides only that a deficiency owed by a bankruptcy estate for a postpetition tax liability, once such a deficiency is determined by the IRS (i.e., at the end of a completed administrative examination), "may" be assessed immediately without regard to the restrictions in I.R.C. § 6213. This simply recognizes that in bankruptcy cases there is no need for the § 6213 stay while the taxpayer has a chance to petition the Tax Court for review, because the automatic bankruptcy stay will preclude collection while the bankruptcy court determines the tax under § 505(a).

The government responded by requesting at least 90 days for the IRS to conduct the administrative examination. The assertion that this request was "granted when [the Court] scheduled the trial of the Administrative Claim and the Objection for November 19, 2003" (Ans.Br. 7-8) overlooks the fact that normally litigation does not proceed until an administrative proceeding is completed. During the 111 days before trial, the Court required all judicial discovery and other pretrial proceedings to be completed and the case to be ready for trial. Section 505(b), in contrast, provides that a trustee or debtor shall not be discharged from liability for a tax unless the IRS has 180 days for an administrative examination, with any judicial proceeding to determine the tax under § 505(a) to begin only after the IRS administrative examination is concluded. The Bankruptcy Court should have granted 90 days that the government requested for an IRS administrative examination and *thereafter* permitted a reasonable period for the Department of Justice to engage in discovery (and, having not done so, should have granted the requested 30-day continuance of the trial).

Generally, the Department does not begin taking discovery while an administrative audit is proceeding. Instead, it waits to see whether the IRS even seeks to dispute any items on a tax return. In this case, it was only when the Department learned that the IRS, as of a few days before trial, had not begun an examination, that the Department began to scrutinize the amended loss-year return on its own, and realize that it exhibited serious problems on its face.

    C.    **The Government Did Not Voluntarily Propose the Discovery Schedule, and the Implication that it Failed to Cooperate in Discovery is Outrageous**

On page 4, the Answer Brief asserts that the IRS "proposed the discovery schedule" and, again on page 28, it asserts that the "discovery period was specifically requested by the IRS." This is a distortion of the procedural history. The government asked for the IRS to have 90 days to conduct a purely administrative examination. If the examination resulted in the IRS finally allowing the claimed overpayment, there would have been no need for a judicial proceeding. Instead, the Court set trial for 111 days later and, the next day, issued a pretrial order that required the parties to confer and propose a reasonable discovery schedule in light of the trial setting. Government counsel was hardly in a position to refuse to obey the Bankruptcy Court's

13

interlocutory orders. He therefore proposed that discovery end two weeks before trial, allowing two weeks for final trial preparations.

This said, we reiterate our regret that the IRS did not begin its examination until just before trial, due initially to a combination of scarce resources available for expedited IRS audits and shortcomings in inter-agency and intra-agency communications. But that is not a basis upon which to relieve the Committee of its burden of proof, or, at the very least, its burden of introducing credible evidence on all material issues. As noted above, contrary to the Answer Brief, Congress explicitly provided that § 7491 applies even in the complete absence of any IRS examination.

On page 17, the Answer Brief asserts that the government "fail[ed] or refus[ed] to state the substantive basis for the Administrative Claim," and "fail[ed] or refus[ed] to put the Debtor on notice of that basis, by fulfilling its duty to conduct an examination of the Debtor's tax filings and business records . . . or otherwise engaging in the discovery process." On page 20, it implies again that IRS was "refusing to participate in the discovery process." There is not an iota of evidence in the record to support that implication, which is improperly directed at attempting to prejudice this Court against the IRS.[8]

First, the IRS did state the basis for its administrative claim – on the cover page transmitting it – which stated that it was for a tentative carryback refund sent out postpetition. (R.156.) Second, the United States proposed discovery plan stated that discovery was to be "limited to . . . The Debtors' fiscal year 2002 operating losses and the carry-back(s) of those losses to prior tax years." (R. 184.) Moreover, the Committee's own discovery plan reflects that it understood the logical focus of the necessary inquiry on the loss carrybacks. (R. 192.) Finally, the government's motion for a continuance of the trial specified that "the amended tax return that was filed for the loss year by [Management], which, among other things, claims $1,000,000 of expenses, including a $450,000 deduction for an amount apparently due to an

---

[8] The Committee complains that the government did not list witnesses in its Rule 26 initial disclosures. (Ans.Br. 8.) But that merely reflects that the IRS had no information about the transactions underlying the claimed loss and carryback claims.

affiliate for management despite the fact that it appears to have had no income, raises questions on its face." (R.209.) This at least indicated to the Committee the need to be prepared to introduce credible evidence on the $1,000,000 in expenses (including the $450,000 management fees expense) and the lack of income at trial.

As a separate point, there is no IRS "duty to conduct an examination" on an expedited basis. To be sure, if a Debtor submits a § 505(b) request with a tax return, the IRS's failure to conduct an examination will have serious consequences. But no § 505(b) request was submitted in this case.

To the extent the Committee complains of lack of sufficient notice of the government's contentions, moreover, it could have taken its own discovery, including by serving contention interrogatories. It chose not to do that because of a misplaced confidence that the burden of proof was on the government from the outset, and it therefore believed, incorrectly, that the government's lack of listed witnesses would result in the government's being unable to prevail. The Committee simply erred strategically, and now hopes this Court, like the Bankruptcy Court, will be so displeased at the government for not starting the examination in the first 90 days, that the Court will indulge the Committee in completely avoiding the merits of the substantive tax issues. Notwithstanding the inter-agency and intra-agency miscommunications that delayed the commencement of an examination, the rest of the American taxpayers should not be penalized, providing a windfall to the Committee, by pretending that the Committee presented credible evidence to support three tax deductions when, in fact, two are at best just not supported (and quite possibly are fraudulent) and one – the only one added on the amended return at the behest of the Examiner – was affirmatively disproved by the Committee's own presentation of evidence.

**Conclusion**

The Court should reverse the judgment of the Bankruptcy Court and remand with instructions to enter judgment in favor of the government.

Respectfully submitted,

 /s/ *Barry E. Reiferson*
BARRY E. REIFERSON
PETER SKLAREW
Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 514-6058

*Local Counsel:*

MICHAEL J. SULLIVAN
United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served this 19th day of May, 2004, upon counsel for the Official Committee of Unsecured Creditors (via the Court's ECF System) at **Mfencer@jagersmith.com**, upon counsel for the Debtors (via the Court's ECF System) at **C.Aframe@worldnet.att.net**, and upon the United States Trustee (by regular e-mail) at **Richard.T.King@usdoj.gov**.

 /s/*Barry E. Reiferson*
Barry E. Reiferson