UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────      )
                                    )
IN RE:                              )
INDUSTRIAL COMMERCIAL               )
ELECTRICAL, INC., I.C.E.            )
MANAGEMENT CORP., and               )
I.C.E.-CONN, INC.,                  )
                                    )
          Debtors                   )
─────────────────────────────      )
                                    )
UNITED STATES INTERNAL REVENUE      )
SERVICE,                            )
          Appellant,                )
                                    )
          v.                        )    BANKRUPTCY APPEAL
                                    )    NO. 04-40038-WGY
OFFICIAL COMMITTEE OF UNSECURED     )
CREDITORS of INDUSTRIAL             )
COMMERCIAL ELECTRICAL, INC.,        )
I.C.E. MANAGEMENT CORP, and         )
I.C.E.-CONN, INC.,                  )
                                    )
          Appellee.                 )
─────────────────────────────      )
```

MEMORANDUM AND ORDER

YOUNG, C.J.                                     January 4, 2004

     This is an appeal, brought under 28 U.S.C. § 158(a)(1), from

an order disallowing an administrative claim by the United States

Internal Revenue Service ("IRS") in the joint Chapter 11

proceedings regarding Industrial Commercial Electrical, Inc.

("ICE"), I.C.E. Management Corp. ("Management"), and I.C.E.-

Conn., Inc. (ICE-Conn.) (collectively "debtors").  After filing

for bankruptcy, Management filed an amended tax return seeking

(and by operation of law receiving) a tentative carryback

adjustment tax refund pursuant to 26 U.S.C. § 6411 (also called a

"quickie refund"), based on Management's reported net operating

loss, and an appointed examiner's determination that $450,000 in

management fees that Management had received from ICE in prior

years should be reversed, because Management had mismanaged ICE's

accounts receivable.  The IRS filed an administrative claim under

11 U.S.C. § 503(b)(1)(B)(ii) to preserve its rights, should it

determine that the adjustment was not justified.  The debtors and

the Official Committee of Unsecured Creditors ("Creditors'

Committee")[1] challenged the claim, and after an evidentiary

hearing, the Bankruptcy Court disallowed the claim.  The IRS

argues on appeal that the Bankruptcy Court abused its discretion

in disallowing the IRS's motion to continue, that its factual

findings were erroneous, and that it erred in applying the burden

shifting framework for determining the validity of the adjustment

---

[1] The Creditors' Committee is prosecuting this appeal, and
apparently prosecuted the objection in the Bankruptcy Court.  It
is unclear from the record to what extent this is an action on
behalf of Management's bankruptcy estate, and to what extent on
behalf of both Management's and ICE's estates.  Moreover, in the
record, "debtors" sometimes refers to ICE and Management, and
other times to ICE, I.C.E.-Conn., and Management.  To simplify
things, the Court will simply use the term "debtors" when
referring to the appellees in this case.  This is appropriate,
given that the Creditors' Committee is in fact acting on behalf
of the estates in this case, just as the debtors would have been
had they prosecuted this action as debtors-in-possession.  It
should be clear from the Court's opinion which parties and
estates, if any, are affected.

in question.

I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    A.    **The Debtors' Pre-petition History**

       The following facts are essentially undisputed or were found by the Bankruptcy Court and are not clearly erroneous.  ICE (incorporated in 1989, Appellant's App. [Doc. No. 3] at 319 (income tax return)) and Management (incorporated in 1995, id. at 337 (income tax return)) were related companies, with Management functioning as a management company for ICE and ICE-Conn., who functioned as operating companies.  Id. at 247 (transcript of 11/19/03 hearing).  The three related companies were under common management, with Daniel Kennedy ("Kennedy") serving as Chief Financial Officer and David LeBlanc ("LeBlanc") serving as President for each company.  Id.  Kennedy and LeBlanc each own fifty percent of the stock in the respective companies.  Id. at 083 (copy of Examiner's Report).  According to the debtors, only Management paid Kennedy and LeBlanc's salaries.  Id. at 291, 295 (transcript of 11/19/03 hearing).  The Examiner's Report (the "Report"), filed with the Bankruptcy Court on October 10, 2002, stated the following with regard to inter-company transactions: "Known irregularities in financial reporting and revenue recognition don't provide ample comfort that related party transactions were accounted for according to the substance of the transaction."  Id. at 097 (copy of the Report).

The debtors' tax returns since 1997[2] reveal inter-company transactions that the IRS claims were designed to evade federal income tax liability.  See Appellant's Br. [Doc. No. 3] at 12-14 & nn.18-21.  Management did not deduct manager salaries on its tax return for tax year 1997, when it only reported taxable income of $351.  Appellant's App. at 357 (tax return).  During the more profitable years from 1998 through 2001, however, manager salaries were deducted, reducing Management's reported taxable income by $1,500,416.00 for that period.  Id. at 359, 361, 363-64, 366, 370, 374, 379 (tax returns).  For the 2002 year (the claimed loss year), Management deducted $105,603 each in salaries for Kennedy and LeBlanc, id. at 375 (tax return), as opposed to the $302,380 deducted for each in 2001.[3]  The 2002 return reports zero gross income and zero cash at the beginning of the year, id. at 329, 335 (tax returns), and the only recorded income is from the affiliates, so either the operating companies paid the remainder of the salaries, or no one did.

Management claimed $319,785 in depreciation in the 1999 tax

---

[2] Management's tax returns for years prior to 2002 were part of an exhibit presented to the Bankruptcy Court, and are thus properly before this Court.  See Appellant's App. at 409 (1/27/04 decision).

[3] The IRS alleges that ICE never paid LeBlanc, even though he performed services for the company, and that this was because ICE "apparently had no taxable income to shelter."  Appellant's Br. at 13.  As the IRS admits, however, there is no record evidence regarding ICE's profit or loss during the relevant years.  Id. at 13 & n.18

return, but had not claimed any depreciation in prior returns, and then claimed another $232,211 for the 2000 tax year. Id. at 363, 366 (tax returns). Management's Schedule L for 2000 indicates accumulated depreciation as of the beginning of the year of $561,768 (on $1,133,360 in depreciable assets). Id. at 369. The IRS argues that because this figure is larger than the reported 1999 depreciation, and Management did not report any depreciation prior to that, that the extra depreciation was reported on one of the affiliate's tax returns, presumably to shelter income. Appellant's Br. at 13. Management deducted $267,663 in depreciation in 2001 and $373,998 in 2002. Although Management's 2002 tax return reported $1,699,162 in depreciable assets as of June 30, 2002, Appellant's App. at 340, the bankruptcy schedules report, as of the September 6, 2002, bankruptcy filing, only a loan receivable from one of its officers and various vehicles of "unknown value." Schedules, Doc. No. 5 in Case No. 02-45453.

Management's sole source of income was the fees it received from the related operating companies. Appellant's App. at 284 (transcript of 11/19/03 hearing). The following table shows Management's gross income and reported income (after deductions) for fiscal years 1997-2002:

| Fiscal Year | Gross Income | Taxable Income as Originally Reported |
|---|---|---|

| 1997 | $1,000 | $351 |
|---|---|---|
| 1998 | $309,455 | $182,802 |
| 1999 | $966,559 | $211,787 |
| 2000 | $1,021,000 | $287,049 |
| 2001 | $1,618,147 | $385,589 |
| 2002 | $0 | ($610,135) |
| **Total** | $3,916,161 | $457,443 |

Appellant's Br. at 14-15 (citing Appellant's App. at 329, 349,
357, 359, 363, 366, 374 (copies of Management's tax returns)).
Management's 2002 tax return asserts that it experienced a net
operating loss of $610,135 in 2002.

**B.    The Bankruptcy Case, the Examiner, and the Tentative
        Federal Income Tax Refund**

Management filed for Chapter 11 protection on September 6,
2002, and its bankruptcy case was ordered jointly administered
with those of ICE and ICE-Conn.  Id. at 001, 067 (copies of the
case docket and of the Bankruptcy Court's 9/6/02 consolidation
order, respectively).  It is important to note that
administrative consolidation, where the cases are managed under
one docket but assets and debts of individual companies are
separated, is different from substantive consolidation, where all
the debtors' collective assets and debts are combined.  See id.
at 067 (copy of the Bankruptcy Court's 9/6/02 consolidation
order); see also In re Babcock & Wilcox Co., 250 F.3d 955, 958 &
nn.5-6 (5th Cir. 2001), and sources cited (explaining the

6

differences between the two kinds of consolidation).  The debtors
continued in the possession of their assets as debtors-in-
possession, pursuant to 11 U.S.C. §§ 1107 and 1108, which means
that the debtors have the powers and duties of a trustee.
Appellee's Br. [Doc. No. 7] at 5.  Flagship Bank & Trust Co.
("Flagship") asserted a secured claim against ICE's estate for
roughly $1,919,902.  Appellant's App. at 045 (copy of claims
register).

On September 11, 2002, after a motion by Flagship to appoint
a Chapter 11 Trustee and upon agreement by Flagship and the
debtors, the Bankruptcy Court ordered that an examiner be
appointed under 11 U.S.C. § 1104, with powers specified in the
court's order.  Id. at 070 (copy of 9/11/02 appointment order).
See Samuel R. Maizel,"Examiners on the rise," The National Law
Journal, Nov. 22, 2004, at 18.  The Bankruptcy Court approved the
United States Trustee's appointment of Stephen Wentzell, CPA (the
"Examiner") as examiner on September 13, 2002.  Id. at 072 (copy
of 9/13/02 appointment order).  On September 18, 2002, the United
States Trustee appointed the members of the Creditors' Committee.
Id. at 078 (copy of 9/18/02 notice of appointment).

The Examiner's primary responsibilities were to investigate
the debtors' affairs and to supervise "all aspects of the
debtor[s'] business." Id. at 082 (copy of Examiner's Report).
Pursuant to that mandate, he began an investigation of the

debtors' finances, and produced an Examiner's Report on October
10, 2002.  Id.  During that investigation, he determined that
roughly $600,000 in ICE's accounts receivable were uncollectible,
essentially due to mismanagement on Management's part.  See id.
at 296 (transcript of 11/19/03 hearing).

He therefore determined that a reversal of certain
management fees that Management had charged ICE in past years
would be appropriate, and after consultation with Paul E. Rogers
("Rogers"), a certified public accountant and tax professional,
he determined that the reversal should be in the amount of
$450,000.  Id. at 263-67 (transcript of 11/19/03 hearing); id. at
404 (1/27/04 decision).  When testifying about these matters
before the Bankruptcy Court, Rogers first stated that the
reversal was for fees charged by Management in fiscal year 2002,
but on cross-examination he admitted that the reversal was
actually for $450,000 paid in prior years, not the loss year.
Id. at 266, 281.  Rogers admitted that he did not use any formula
to reach the $450,000 figure, but rather relied on his "seasoned
judgment."  Id. at 281, 283-84.  The Bankruptcy Court, however,
described the relevant facts as follows: "[T]he Examiner
discovered that Management, which collected a management fee
based upon the success of ICE and I.C.E.-Conn, had charged a
management fee of approximately $450,000 for FY 2002.  Because
the Examiner determined that ICE had actually sustained losses

8

for this same period, the management fee was reversed."
Appellant's App. at 404 (1/27/04 decision).

Accordingly, on or about December 17, 2002, Management filed
an amended 2002 federal income tax return, reflecting the
$450,000 reduction in income and increasing the net operating
loss by that amount.  Id. at 404 (1/27/04 decision).  The return
was accompanied by an application for a tentative refund (Form
1139) under 26 U.S.C. § 6411, on the grounds that the $1,060,135
(adding the $450,000 loss to the original net operating loss) was
being carried back, pursuant to 26 U.S.C. § 172, to Management's
tax years ended 1997 through 2001.  Id.  The IRS notes that the
$450,000 reduction is almost exactly the same amount as the
$457,443 net reported income for 1997 through 2001, and thus
would have the effect of virtually eliminating all of
Management's federal income tax liability for that period.
Appellant's Br. [Doc. No. 3] at 16-17.  The Application for
Tentative Refund (Form 1139) resulted in a tentative refund of
$347,345.56, which the IRS remitted on or about May 22, 2003.
Appellant's App. at 214, 225, 253, 404.  There is no evidence
that the debtors (as debtors-in-possession) made any request for
an expedited examination of tax liability incurred during
administration of the case under 11 U.S.C. § 505(b) (failing to
utilize a power that they had under 11 U.S.C. § 1107).  Such a
request would have required the IRS to determine within 60 days

9

whether an audit was necessary and to complete the audit within another 120 days, or within a longer time if the Bankruptcy Court allowed.  11 U.S.C. § 505(b).  The IRS never made an assessment of tax or issued a notice of deficiency regarding any of the debtors.  Appellant's App. at 309-10 (transcript of 11/19/03 hearing).

At the same time that Management filed its amended return, ICE likewise amended Schedule L in its Form 1120X for 2002 to reflect additional income of $450,000, "due from affiliate."  <u>Id.</u> at 315.  Even with this boost to reported income, ICE still reported a loss of $20,644 for the year, so its 2002 income tax liability remained at $0.  <u>Id.</u>  ICE never filed a claim against Management in its bankruptcy case.  <u>Id.</u> at 058-66.

The Bankruptcy Court set April 13, 2003 as the deadline for filing claims for pre-petition debts.  <u>Id.</u> at 127-28 (2/26/03 order).  On April 18, 2003, the Bankruptcy Court approved a sale of "substantially all" of the debtors' assets.  <u>Id.</u> at 024.  On June 9, 2003, at the debtors' request and with the Creditors' Committee's consent, the Bankruptcy Court established July 8, 2003, as the bar date for the filing of all administrative claims.  <u>Id.</u> at 133.

## C.   The IRS's Administrative Claim and the Debtors' Objection

On June 18, 2003, less than a month after it had remitted the post-petition tentative refund, the IRS filed a  "protective"

administrative claim under 11 U.S.C. § 503(b)(1)(B) for payment
of the refund, pending an investigation into the validity of the
claimed net operating loss carryback.  _Id._ at 156-57.  The IRS
stated that it would amend this administrative claim to $0 if the
carryback proved valid.  _Id._ at 156.

On July 8, 2003, the Creditors' Committee filed a motion
(_id._ at 147-53) to approve a stipulation (_id._ at 138-46) among
the Committee, the debtors, and Flagship, stating that they would
agree to a fixed value for Flagship's secured claim so long as
the IRS's administrative claim was withdrawn or disallowed by
August 30, 2003.  _Id._ at 141, 143.[4]  The Bankruptcy Court
approved the settlement on July 31, 2003.  _Id._ at 167.

On July 9, 2003, the debtors objected to the IRS's
administrative claim and moved to require the IRS to audit the
loss-year tax return and respond to the objection within thirty
days.  _Id._ at 154-55 (objection); _id._ at 405 (1/27/04 decision).

---

[4] Apparently, neither the motion, nor the stipulation, nor
notice of the hearing was served on the IRS, despite the
requirement of Bankruptcy Rule 2002(a)(3) that notice of all
compromise or settlement hearings be given to all creditors.  _Id._
at 146, 153; Appellant's Br. [Doc. No. 3] at 7-8.  As the IRS
notes elsewhere, however, in bankruptcy law the term "creditors"
does not include administrative claimants.  _See_ _infra_ note 6.
Regardless of whether the IRS is a "creditor" for purposes of
Rule 2002, the better course would be to give notice to all
potentially interested parties, especially where, as here, the
potentially excluded party's interest is so similar to that of a
pre-petition creditor.  The IRS was an administrative claimant
against its will, and a more prompt application for a refund
would have made the IRS a pre-petition creditor.

At the July 31, 2003 hearing on the matter, though it had been the debtors who had objected to the claim, the debtors' counsel said this was "not really the debtors' fight," and the Creditors' Committee's counsel and Flagship's counsel requested that the IRS be given sixty days, with an evidentiary hearing to be set thirty days after that deadline. Id. at 171-72 (7/31/03 hearing transcript).[5] The IRS requested ninety days, but stated that even ninety days would be "a very short time frame" to conduct its investigation, particularly because the IRS did not yet have information to back up its claim. Id. at 172-73; id. at 405 (1/27/04 decision). The Bankruptcy Court criticized the IRS, stating that creditors have to verify their claims "under penalties of perjury." Id. at 173-75.[6] The Creditors' Committee

---

[5] Role confusion appears to be a common theme in this case. Pursuit of a refund is very much "the debtors' fight," because they are operating as debtors-in-possession. Like a trustee, it is the duty of the debtors-in-possession to manage the assets of the bankruptcy estate for the benefit of the creditors, and that includes recovering money owed to the estate by other parties. As the Court explains infra, however, there was nothing improper in having the Creditors' Committee prosecute this case. Indeed, the Committee's original attempt to have a trustee appointed likely reflected a lack of confidence that the debtors could be trusted to manage the estates in the creditor's interests.

[6] As an administrative claimant, the IRS was under no obligation to verify, certify, or support by documentation its administrative claim, as that requirement applies to "creditors" -- that is, individuals or entities with pre-petition claims -- and not to post-petition administrative claimants under Section 503. See 11 U.S.C. § 101(10) (defining "creditor" as an entity with a pre-petition claim); Fed. R. Bankr. P. 3001 (laying out requirements for a "creditor's" claim); cf. In re Indian Motorcycle Co., 261 B.R. 800, 809-10 (1st Cir. BAP 2001) (holding

then argued that the IRS had had seven months since the request for the tentative refund to investigate.  Id. at 176-77.

That day, the Bankruptcy Court set an evidentiary hearing for November 19, 2003, allowing 111 days for the IRS to conduct its investigation and for the United States Department of Justice to prepare for trial, and ordered Management and the Creditors' Committee to provide prompt access to all documents the IRS requested.  Id. at 179 (7/31/03 order).  The Bankruptcy Court set November 5, 2003, as the discovery deadline.  Appellee's App. [Doc. No. 8] at 100-101.  The parties made their respective initial disclosures in late August and early September, Appellant's App. at 190, 196, and the debtors claimed not to have any relevant records, though "certain of the Debtors' tax related documents" were said to be in the possession of counsel to the Creditors' Committee and of Henry Frye ("Frye"), the debtors' former outside accountant, id. at 188.[7]  It became clear that the

---

that the estimation provision in 11 U.S.C. § 502, which governs pre-petition claims, does not apply to 11 U.S.C. § 503, which governs administrative claims).  The Court discusses these matters at greater length infra.

[7] There is some dispute about whether the IRS served initial disclosures on the debtors, see Appellant's App. at 238-43.  The question is largely academic.  Since the IRS did not seek to present any witnesses at the evidentiary hearing, the Bankruptcy Court held that this mooted the Creditors' Committee's motion under Federal Rule of Civil Procedure 37(c) (id. at 213-18) to exclude any testimonial evidence the IRS might present and that the hearing would proceed with no sanction against the IRS.  The debtors have not challenged the Bankruptcy Court's rulings.  See id. at 242-43.

IRS and the debtors disagreed as to who bore the burden of proof. See id. at 209 (United States' Emergency Motion to Continue).

On November 14, 2003, the IRS filed an emergency motion for a thirty-day continuance of the evidentiary hearing so that it could "conduct a thorough examination," which it claimed "scarce resources" had prevented it from doing to date. Id. The Bankruptcy Court denied the motion, id. at 212 (order of 11/17/03), later explaining at the evidentiary hearing that the United States had provided "no justifiable reason" for a continuance. Id. at 241 (transcript of 11/19/03 hearing). At the hearing, the IRS acknowledged that the matter had "fallen through the cracks until quite recently." Id. at 243.

Roughly two days before the evidentiary hearing, the IRS asked the Creditors' Committee, which had claimed to possess the debtors' tax-related documents, for copies of the debtors' tax returns for the relevant periods. Id. at 238-39 (transcript of 11/19/03 hearing). The Committee directed the IRS to Frye, id. at 239, and the IRS claims that Frye told counsel that he did not have any relevant documents, Appellant's Br. at 10.

The Bankruptcy Court had ordered that a joint pre-trial memorandum be filed, but no such memorandum was ever filed, apparently due solely to failures on the part of the IRS. See Appellant's App. at 241-42 (transcript of the 11/19/03 evidentiary hearing); id. at 406 (1/27/04 decision).

14

**D.    The Evidentiary Hearing**

At the evidentiary hearing, the Creditors' Committee prosecuted the debtors' objection, asserting that the IRS bore the burden of proof and arguing that it should not have to offer evidence to support the objection. Id. at 239, 244 (transcript of 11/19/03 hearing). The Bankruptcy Court initially agreed, but erred on the side of caution and had the Committee present its case. See id. at 243-44. That case consisted of testimony by the Examiner and by Rogers, and of three exhibits -- ICE's amended and original tax returns for tax year 2002, Management's amended tax return for tax year 2002, and the Application for tentative Refund with attached tax returns for the carryback years. See id. at 409 (1/27/04 decision).[8]

The Examiner admitted to having no personal knowledge regarding the facts underlying any of the line-items on the tax return for the loss year ending June 30, 2002. Id. at 258 (transcript of 11/19/03 hearing). Rogers admitted that he had never examined the debtors' books and records, but rather accepted as true everything that was reported on the tax returns. Id. at 268-69. At the close of the IRS's case, the parties

---

[8] The Bankruptcy Court stated that Management's original tax return for tax year 2002 was attached to the amended return, but this was not in fact the case. The court was apparently referring to an amended Form 1120. See Appellant's App. at 409 (1/27/04 decision); id. at 349 (copy of amended Form 1120); Appellant's Br. at 11 n.15.

15

rehearsed their respective positions regarding the burden of
proof, and the IRS requested to be permitted to continue its
investigation and to have the record kept open. <u>Id.</u> at 306-09.
The Bankruptcy Court denied both requests and ordered the parties
to submit post-trial memoranda regarding the burden of proof.
<u>Id.</u> at 311, 313.

**E.    The Bankruptcy Court's Decision**

The Bankruptcy Court issued its decision on January 27,
2004.  It held that the burden of proof was governed by 26 U.S.C.
§ 7491, which initially places the burden on the taxpayer but,
should the taxpayer meet certain conditions, shifts it to the IRS
on any factual issue in regard to which the taxpayer introduces
"credible evidence."  Appellant's App. at 412 (1/27/04 decision).
The conditions include the requirements that the taxpayer
substantiate certain items, that it cooperate in preserving and
providing all required documentation and other information as
described in 26 U.S.C. § 7430(c)(4)(A)(ii).  The court sustained
the debtors' objection to the administrative claim, holding that
the debtors had presented credible evidence that Management was
entitled to the tentative refund.  <u>Id.</u> at 415-18 (1/27/01
decision).

The Bankruptcy Court summarized the credible evidence that
the debtors had presented.  He noted the testimony of the
Examiner and Rogers regarding their discovery of the

16

uncollectible accounts receivable.  Id. at 413-14.  He then
summarized how, based on their expertise, the two had determined
the appropriate tax consequences of Management's mismanagement.
Rogers testified that although he did not know exactly how
Management calculated its management fee, in his experience such
fees were based on the success of business operations.  Id. at
414 (quoting Rogers).  The Bankruptcy Court inferred that the
determinations the Examiner and Rogers made in adjusting the
reported income for Management and ICE in fiscal 2002 included
the calculation of Management's fee.  Id.

        The Bankruptcy Court addressed the IRS's response as
follows:

> The IRS attempted to make much of the fact that neither
> the Examiner nor Mr. Rogers had any first-hand
> knowledge of the operations of the Debtors for the tax
> years for which the net operating losses were carried
> back.  That neither the Examiner nor Mr. Rogers
> undertook an independent audit of all of the relevant
> transactions, however, is irrelevant and does not
> demonstrate that their seeking the refund was
> inappropriate.  Mr. Rogers is an expert as is the
> Examiner.  As such they are not required to testify as
> to each fact underlying their ultimate opinions.  Fed.
> R. Evid. 705.  Further, given the IRS's lack of notice
> as to the substantive basis for its Administrative
> Proof of Claim, neither the Examiner nor Mr. Rogers had
> all of the Debtors' books and records before them
> during the hearing.  Thus there were some questions
> which they were unable to answer.  Their inability to
> provide the specific information at trial does not
> prove that the information does not exist and that
> their reliance upon the Debtor's books and records was
> unreasonable.  Moreover, if the Court were to accept
> the IRS's position, no trustee or examiner would ever
> be permitted to correct or amend a tax return and the
> unequal playing field which Congress wanted to level

> [with the Internal Revenue Service Restructuring and
> Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685]
> would remain skewed in the IRS's favor.

Id. at 414-15 (footnotes omitted).

The bankruptcy judge found credible the testimony of Rogers
and the Examiner, and their reliance on the returns prepared by
prior accountants reasonable and reliable.  Id. at 415.  He noted
that "the definition of credible evidence indicates it is not a
high threshold for a taxpayer to meet."  Id.  Because the
debtors' evidence was not "implausible or frivolous," the burden
shifted to the IRS, who had presented no evidence whatsoever.
Id. at 416.  The Court also noted that

> under the quickie refund procedure, once the taxpayer
> receives his tentative refund, the IRS has the
> responsibility to conduct an investigation into the
> propriety of the refund and issue an assessment for any
> portion to which the taxpayer was not entitled.  Here
> there was no assessment, simply the IRS's failure to
> act within the abbreviated time frame requested by the
> IRS and agreed to by the Court.

Id.

The Bankruptcy Court next addressed the IRS's argument that
the administrative proof of claim should be presumed valid and
that the burden of going forward to extinguish that presumption
was on the debtors.  The court found two flaws in the argument.
Id.  First the request for payment of an administrative expense
is not the same as a proof of claim, the latter of which is
indeed prima facie evidence of its own validity.  Id. at 416-17.
Second, even if the administrative claim should be treated like a

proof of claim for a pre-petition debt, the IRS "only asserted that it <u>may</u> have a claim." <u>Id.</u> at 417.  The claim was "self-contradictory" insofar as the cover letter accompanying it expressed uncertainty as to whether the claim was for all, some, or none of the refunded amount.  <u>Id.</u> (citing <u>In re Colt Engineering, Inc.</u> 288 B.R. 861, 878 (Bankr. C.D. Cal. 2003)).  Thus, the IRS "had no greater rights or presumptions than it had under the Internal Revenue Code." <u>Id.</u>[9]

## II. DISCUSSION

The IRS presents five questions on appeal.  Appellant's Br. at 4-5.  It argues that the Bankruptcy Court (1) abused its discretion in refusing to allow the IRS's motion to continue, (2) misinterpreted the facts in treating the $450,000 deduction of management fee expenses as the reversal of unpaid fees rather than as the discharge of a liability to repay management fees, (3) wrongly held that the debtors had presented "credible evidence" to support the "quickie refund" they claimed, (4) wrongly shifted the burden of proof to the IRS without addressing whether Management complied with IRS requirements to substantiate its deductions, and (5) wrongly shifted that burden without addressing whether Management maintained required records or complied with appropriate requests for information.

---

[9] The IRS has wisely abstained from challenging this holding.

19

**A.    Standards of Review**

The Court reviews Bankruptcy Court discretionary judgments like the denial of the motion to continue for abuse of discretion, <u>see, e.g.</u>, <u>Jamo</u> v. <u>Katahdin Fed. Credit Union (In re Jamo)</u>, 283 F.3d 392, 403 (1st Cir. 2002) (reviewing a Bankruptcy Court's imposition of sanctions for abuse of discretion), factual findings for plain error, Fed. R. Bankr. P. 8013, and conclusions of law <u>de novo</u>, <u>Brandt</u> v. <u>Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.)</u>, 132 F.3d 104, 107 (1st Cir. 1997).

**B.    Abuse of Discretion**

The IRS argues that the Bankruptcy Court abused its discretion in refusing to grant a continuance.  There was no error.  For government counsel to claim "scarce resources" is the last refuge of the unprofessional and the unprepared.  Here it is even worse; certainly disingenuous and perhaps mendacious.  It is untrue.  "Scarce resources" have nothing to do with IRS inadequacies in this case; the truth is that the matter simply "slipped between the cracks."

Unfortunately, the federal government is all too frequently resorting to this inadequate canard in recent months.  In this session alone, to my surprise, the government has previously twice raised this claim in the past six months.  <u>See</u> <u>United States</u> v. <u>Mazzeo</u>, 306 F. Supp. 2d 294, 316, 325 (E.D.N.Y. 2004); <u>Rakes</u> v. <u>United States</u>, C.A. No. 02-10480 (1st Cir. Oct. 28,

20

2004) (denial of motion for emergency writ of mandamus) (ruling on government's complaint of having to divert resources to comply with discovery order notwithstanding earlier nine month stay to allow completion of related criminal action upon express representation that government would then be prepared to make discovery; Transcript of November 16, 2004 Hearing [Doc. No. 261]).

Counsel must understand that the filing of such a pleading directly impugns the President for not seeking sufficient funds to insure the discharge of his constitutional duty to see to it "that the Laws be faithfully executed," U.S. Const. art. II, § 3, - or the Congress for failing to appropriate such funds, U.S. Const. art. I, § 9, cl. 7, - or both.  If the court order is proper, such claims must be rejected out of hand. Here, the Bankruptcy Court did precisely that.

The IRS next points out several times that it would ordinarily have three years to investigate a "quickie refund," and that this thus suggests that they should receive some indulgence in the bankruptcy process, see, e.g., Appellant's Br. at 41-42.  This argument is unpersuasive.  Most claims against a bankruptcy estate are in the form of contract or tort claims, and statutes of limitations for pursuing such claims are often three years or more, see Mass. Gen. Laws, ch. 260, § 2 (six-year limitations period in contract actions); id. § 2A (three-year

limitations period in tort actions), but contract and tort claimants have to comply with the deadlines set by the Bankruptcy Court, regardless of how long they would have had to pursue their claims outside of bankruptcy.  See, e.g., 11 U.S.C. § 1141(d)(1)(A) (providing that confirmation of a Chapter 11 plan "discharges the debtor from any debt that arose before the date of such confirmation," regardless of whether a proof of claim was filed).  Thus, the three-year examination period is not, in itself, grounds for indulgence.

More compelling is the IRS's argument that 11 U.S.C. § 505(b) suggests the minimum reasonable time for requiring the IRS to investigate its claim.  By granting the trustee a right to seek an expedited determination of "unpaid liability of the estate for any tax incurred during the administration of the case," Section 505(b) strongly suggests that the 180-day period it prescribes for such a review is the minimum amount of time the Bankruptcy Court must give the IRS before requiring it to substantiate any tax-related claim.  It is almost certainly the case that failure to grant a request by the IRS to have 180 days from an appropriately chosen benchmark date, be it the date a refund was requested, the date it was granted, or some other date, would constitute an abuse of discretion.  In this case, however, the IRS did not demand that much time.  It requested 90 days, and the Bankruptcy Court gave it 111.  Having established

22

this schedule, the Bankruptcy Court did not abuse its discretion in requiring adherence to it, particularly given that the only justification provided for the continuance was the IRS's own carelessness in losing track of the investigation. Having waived any right it had to a later date for the evidentiary hearing, the IRS cannot now reassert such a right.

   **C.   The Reversal of $450,000 in Management Fees**

   The Bankruptcy Court's determination with respect to the propriety of adjusting Management's fiscal 2002 income to account for the reversal of $450,000 in Management Fees had several explicit and implicit components. First, it contained a conclusion about the proper framework for allocating the burden of proof, and the extent to which the debtors qualified for the benefits of 26 U.S.C. § 7491. Second, it contained a legal determination as to which evidence was admissible and competent. Third, it contained a factual conclusion about what that evidence would show, to the extent the court credited it. Fourth, it contained a legal conclusion as to whether such a showing would entitle the debtors to sustain their objection, partially or in full.

   The factual and legal determinations are difficult to disentangle from one another, however, because a court's interpretation of "what happened" in the course of inter-corporate transactions is necessarily informed by the relevant

law.  Here, the Bankruptcy Court was faced with three closed
corporations under common management and ownership.  Even when
owners and managers in such arrangements operate with scrupulous
regard for the corporate form, the capacity in which such a
person is acting -- as an owner or as a manager, and on behalf of
which corporation -- will often be a mixed question of fact and
law.  It is by no means clear here that the owners and managers
in fact displayed scrupulous regard for the corporate form, and
that only complicates matters further.

Just as the legal and factual elements of the debtors'
actions may be difficult to separate, so it requires some care to
delineate which elements of the Bankruptcy Court's determination
regarding the $450,000 reversal were legal error, and which were
based on clearly erroneous factual findings.  There can be little
doubt, however, that the Bankruptcy Court reached the wrong
conclusion, and that his sustaining of the debtors' objection
must be vacated at least with regard to the $450,000 reversal.

For purposes of this decision, the Court will presume that
the Bankruptcy Court's determinations regarding the admissibility
and competence of the testimony by Rogers and the Examiner did
not constitute abuse of discretion.  The Bankruptcy Court could
only rely on that evidence for what it actually tended to show,
however, and that testimony would tend to show that Management
had in fact mismanaged ICE's accounts receivable, causing losses

24

of at least $600,000.  It would also tend to support a conclusion
that Management was not entitled to all of the management fees it
had collected in previous years, and that it was legally
obligated, under contract, tort, or other commercial law, to
return $450,000 in fees.  What it does not support, however, is a
basis for altering Management's federal income tax liability.

The Examiner and the debtors essentially treat the
reallocation of the $450,000 like the correction of an accounting
error.  They have shifted $450,000 from Management's books to
ICE's books in the same way one would restate improperly
allocated or recognized revenue.  Under this logic, "what
happened" in fiscal year 2002 was that Management accidentally
failed to transfer the $450,000 it was supposed to pay back to
ICE, or transferred it but forgot to reflect the transfer in its
income tax return -- in other words, the sort of error that would
occur through a computer glitch or human oversight.

ICE and Management are separate corporate entities, however.
Much as Kennedy and LeBlanc may have abused the corporate form,
no one has sought to pierce the corporate veil, and the debtors'
bankruptcy cases have only been administratively consolidated,
not substantively consolidated.  Each entity has its own assets,
and each is responsible for paying its own debts.  Indeed, the
very premise behind subtracting $450,000 from Management's books
and adding $450,000 to ICE's is that they are separate entities.

25

Thus, the $450,000 deduction must be analyzed as if Management and ICE were separate entities, because that is how the law treats them.

As the IRS correctly argues, Appellant's Br. at 23, any obligation for Management to pay back $450,000 to ICE must be due to something like a contract or tort liability.  This would be a debt, in other words, and ICE's proper course upon discovering the debt would be to file a proof of claim in Management's bankruptcy case.  ICE would then join the other unsecured creditors at the back of the line for repayment, and would most likely not receive anything, because Management's bankruptcy estate is apparently administratively insolvent.  ICE has not filed a claim, however, and the deadline to file one, April 13, 2003, has long passed.  A successful discharge in this case would therefore eliminate the $450,000 debt altogether.  See 11 U.S.C. § 524.[10]

The privilege of incorporation conveys certain benefits, but those benefits entail certain responsibilities as well.  All too often, individuals are eager to have the limited liability and

---

[10] There are exceptions to discharge that are not relevant here.  For example, under 11 U.S.C. § 523, if a debtor fails to list or schedule a debt in time to permit the relevant creditor to file a claim, then that debt is excepted from discharge, unless the creditor had notice or actual knowledge of the case in time to file a claim.  Here, ICE obviously knew of Management's bankruptcy case in plenty of time to file a claim, because its principals are the same as Management's, and ICE therefore "discovered" the debt in plenty of time to file a claim.

other benefits that accompany the corporate form, but then
express outrage when courts of law require them to accept the
relevant responsibilities and limitations.  See Berger v. H.P.
Hood, Inc., 416 Mass. 652, 658 (1993) ("Corporations may not
'assume the benefits of the corporate form and then disavow that
form when it is to their and their stockholders' advantage.'"
(quoting Gurry v. Cumberland Farms, Inc., 406 Mass. 615, 626
(1990))).[11]  Corporate owners are allowed to avoid liability
beyond the extent of their investment because of the fiction that
the corporation is a separate entity.  See, e.g., Spaneas v.
Travelers Indem. Co., 423 Mass. 352, 354 (1996) ("A corporation
is an independent legal entity, separate and distinct from its
shareholders, officers, and employees.").  That fiction requires,
however, that the corporation in fact be treated and operated
like a separate entity.  Even when joint owners of related
corporations fail to treat and operate those corporations as
separate entities, and when the inter-corporate transactions in
the corporations' respective accounting legers have little

_____

[11] The Court refers to Massachusetts corporate law, because
under First Circuit law "Bankruptcy Courts should only modify the
usual state-law compendium of rights and remedies if and to the
extent that such modifications are specifically authorized or
directed by the Bankruptcy Code."  In Re Bank of New England
Corp., 364 F.3d 355, 363 (1st Cir. 2004).  The Court is unaware
of any provision in the Bankruptcy Code that would preclude
application of Massachusetts corporate law, and the principles
the Court discusses are, in any case, common to the corporate law
of the several states, and would undoubtedly be reflected in any
federal common law rule that the courts might adopt.

27

"reality," the law treats those transactions as if they were
between two separate entities, unless someone injured by the
corporations' conduct can supply a sufficient reason to do
otherwise.  <u>See, e.g.</u>, <u>Spaneas</u>, 423 Mass. at 354 ("Only in rare
instances, in order to prevent gross inequity, will a
Massachusetts court look beyond the corporate form.").  Thus,
barring a successful attempt by some party to prove that the
debtors should be treated as a single entity, the Court must
reconstruct what "actually happened" by assuming that ICE and
Management were separate entities.

　　　If Management and ICE had been under separate ownership and
management, truly engaging in transactions at arms' length, then
the story would have proceeded as follows: The two companies
would have had a contract for the management of accounts
receivable, though it might have been implied, verbal, or both.
Management's poor performance would have constituted a breach of
the agreement.  ICE would have paid the agreed management fees,
either out of ignorance of Management's breach or to stay in
compliance with the agreement pending litigation or negotiation
regarding the consequences of Management's breach.  In any case,
Management would then have had a liability of $450,000, the
amount it had wrongfully collected from ICE.  ICE would not have
collected that money before Management filed for bankruptcy,
however, and at that point, ICE's only recourse would have been

to follow the procedures under the Bankruptcy Code for presenting claims based on unsecured, pre-petition debts.

In bankruptcy law, the filing of the petition for bankruptcy protection is a central event, creating the bankruptcy estate and dividing the temporal universe into "pre-petition" and "post-petition."  When the petition is filed, an automatic stay comes into effect, see 11 U.S.C. § 362, which forbids creditors from taking any action to collect on a debt, other than filing a proof of claim with the Bankruptcy Court, see id. § 501.  In a corporate bankruptcy, if appropriate, a trustee or debtor in possession continues operating the business.  In distributing the assets of the estate in Chapter 7, the order of priority is: (1) secured claims, to the extent of the value of their collateral; (2) administrative claims (including the IRS's claim here); (3) unsecured post-petition claims incurred in the ordinary course of business ; (4) unsecured pre-petition claims.  See id. §§ 507, 725, 726.  In Chapter 11, unless the relevant parties agree otherwise, a plan can only be confirmed if each class of claimants will receive as much as it would have, had the debtor's estate been liquidated under Chapter 7.  See id. § 1129.

Assuming that the $450,000 is a legitimate debt, it was incurred pre-petition.  The conduct which gave rise to it occurred pre-petition, and the premise of the amended tax return is that "repaying" the $450,000 redresses overcharging for

29

services rendered during the tax year ending June 30, 2002, and during years prior. In fact, neither Management's original 2002 tax return nor its amended one reflects any income for 2002, so all that can be said is that management fees were paid in years prior to 2002, and that at some point Management's failure to perform obligated it to return $450,000 of the fees it received during those years. <u>See</u> Appellant's App. at 329 (Management's amended 2002 return).

There is no combination of facts or possible events under which Management could claim the $450,000 reduction in its 2002 income. ICE has no power to collect on the debt during the pendency of the bankruptcy case, so the earliest the debt would come due would be upon discharge (in which case ICE would apparently receive zero cents on the dollar) or upon dismissal of Management's case (for bad faith, say). In the former situation, the debt would cease to exist. Both Management and ICE are set to sell "substantially all" of their assets, meaning that this case has essentially been transformed into a Chapter 7 case, and both entities will cease to exist after the case closes. In other words, the only way the debt can ever come due is if ICE manages a miraculous comeback and continues to exist, if Management's case is dismissed (i.e., no discharge), and if the debt is in fact a valid one. Needless to say, Management has presented no "credible evidence" to explain why, if it paid ICE

the $450,000 on that unlikely future date, it should be able to
count the discharge of that liability on its 2002 return, rather
than on a future return.  Similarly, even in the unlikely event
that, upon discharge, ICE receives more than zero cents on the
dollar for its debt, Management has not provided "credible
evidence" to count this likely minuscule payment on its 2002
return, rather than on a future return.

> Under an accrual method of accounting, a liability
> . . . is incurred, and generally is taken into account
> for Federal income tax purposes, in the taxable year in
> which all the events have occurred that establish the
> fact of the liability, the amount of the liability can
> be determined with reasonable accuracy, and economic
> performance has occurred with respect to the liability.

See 26 U.S.C. § 461(h)(4).  The earliest that economic
performance can be said to have occurred is in December 2002, and
that means that the earliest that Management could claim a
$450,000 deduction would be on its 2003 tax return.  As the Court
will explain below, however, the filing of the amended tax return
was improper and, barring unusual circumstances, Management could
not engage in economic performance until after discharge.  Even
then, it could only engage in economic performance if the debt
remained undischarged, and both ICE and Management continued to
exist.  Needless to say, this would only push the appropriate
reporting year further into the future.

Management's filing of its amended return was improper,
because it was a post-petition transfer of the bankruptcy

31

estate's assets to a pre-petition creditor.  Post-petition, all of Management's assets became property of the estate.  See 11 U.S.C. § 541.  A trustee or debtor in possession cannot transfer property of the estate, other than in the ordinary course of business, without notice and a hearing, nor could the Examiner do so in this case.  Id. § 363(b).  Management filed its amended tax return and request for a "quickie refund" in December 2002, post-petition.  It subtracted $450,000 from its originally reported 2002 income, and $450,000 "due from affiliate" was added to ICE's income for that year.  This effectively constituted a transfer of $450,000 to a pre-petition creditor.  By no definition can this be considered an "ordinary course" transaction.  To the contrary, it constitutes a preferential transfer to a pre-petition creditor, a transaction inimical to the whole idea of bankruptcy.

Still, after notice and a hearing, a trustee or debtor in possession could perhaps make such a transfer, if the Bankruptcy Court approved and if it were not otherwise contrary to law. See id. § 363(b).  All of the creditors in this case have apparently approved of the transfer, having conditioned a stipulation of settlement regarding the value of Flagship's secured claim on disallowance of the IRS's claim.  There has arguably been notice and a hearing, if only in the form of the November 19, 2003 evidentiary hearing.  Still, it is clear from the record and from the Bankruptcy Court's January 27, 2004

decision that the Bankruptcy Court did not think it was approving a preferential transfer.  In any case, allowing this sort of preferential transfer for the sole purpose of diminishing the value of the IRS's administrative claim would constitute an abuse of discretion.

Even had the Bankruptcy Court properly allowed such a gratuitous transfer, there are several reasons why it nevertheless would not be allowable as a deduction; no debt exists (because no proof of claim was filed); no debt is yet due; the amount of the debt cannot be determined for tax purposes, because it will be reduced or eliminated upon discharge; the deduction cannot be claimed for any year prior to 2003; ICE will likely no longer exist to collect the debt; and Management will likely cease to exist before it ever has to pay any debt.

Finally, the Court notes that any transfer of the $450,000 would fall under the "sham in substance" doctrine, under which deductions are not allowed for transactions that are "mere devices to avoid tax liability." Dewees v. C.I.R., 870 F.2d 21, 29-30 (1st Cir. 1989) (collecting cases).  ICE has no enforceable debt against Management.  Both companies will likely cease to exist at the end of this bankruptcy case.  The sole purpose of a gratuitous transfer of $450,000 between the two entities is therefore to reduce tax liability.

**D.    Credible Evidence Regarding Other Issues**

The Bankruptcy Court has the authority under 11 U.S.C. § 505(a)(1) to "determine the amount or legality of any tax" imposed on a debtor.  As the Bankruptcy Court explained, under 26 U.S.C. § 7491, the burden of proving entitlement to a "quickie refund" falls initially on the taxpayer, who must produce "credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer."  The statute reads, in pertinent part:

**(a) Burden shifts where taxpayer produces credible evidence.--**

**(1) General rule.**--If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.

**(2) Limitations.**-Paragraph (1) shall apply with respect to an issue only if--

**(A)** the taxpayer has complied with the requirements under this title to substantiate any item;

**(B)** the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews; and

**(C)** in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).

Subparagraph C shall not apply to any issue if any other provision of this title provides for a specific burden of proof with respect to such issue.

34

26 U.S.C. § 7491.  Section 7491 applies in bankruptcy, because "the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it." <u>Raleigh</u> v. <u>Illinois Dep't of Revenue</u>, 530 U.S. 15, 26 (2000).

As the Bankruptcy Court correctly noted, Appellant's App. at 412 (1/27/04 decision), although the Internal Revenue Code does not define "credible evidence," the legislative history of Section 7491 provides valuable guidance:

> Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness).  A taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions, frivolous claims, or tax-protestor-type arguments.  The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief.  If after evidence from both sides, the court believes that the evidence is equally balanced, the court shall find that the secretary has not sustained his burden of proof.

H.R. Conf. Rep. No. 105-599, at 240-41 (1998).

The debtors seek to carry back not only the $450,000 in additional loss alleged for 2002, but the original net operating loss as well.  Even if the debtors had produced credible evidence regarding the $450,000 in reversed fees, they could not have shifted the burden to the IRS on the issue of the carryback of the original net operating loss without providing credible evidence as to the income and loss originally alleged for 2002. Under 26 U.S.C. § 172(c), "'net operating loss' means the excess

35

of the deductions allowed by this chapter over the gross income."
To establish the validity of the net operating loss, then, the
debtors must produce credible evidence regarding the amount of
gross income and the amount of the deductions that produced the
net operating loss.

     1.    **The Ability of the Creditors' Committee to invoke 26 U.S.C. § 7491**

     The IRS briefly argues that because the Creditors'
Committee, who prosecuted the objection, is not in fact the
"taxpayer," it should not be able to take advantage of the
burden-shifting framework in 26 U.S.C. § 7491.  This argument is
without merit.

     When a corporation files for bankruptcy, its assets become
part of the bankruptcy estate, and that estate is managed by a
trustee or debtor in possession on behalf of the creditors, who
have priority over shareholders.  See <u>Commodity Futures Trading</u>
<u>Comm'n</u> v. <u>Weintraub</u>, 471 U.S. 343, 355-56 (1985).  When a trustee
or debtor in possession seeks to reduce the corporation's tax
liability, it is seeking to maximize the assets of the estate,
for the benefit of the creditors, much as it does in exercising
the various avoiding powers it has under the Bankruptcy Code.
<u>See</u> 11 U.S.C. §§ 544, 545, 547, 548, 549, 553.  There can thus be
little doubt that a trustee or debtor in possession, acting on
the estate's behalf, could invoke 26 U.S.C. § 7491.

     The Bankruptcy Code also allows other parties in interest to

act on the estate's behalf, and here the creditors' interests are more intimately tied to the estate's than are those of any other parties (including the shareholders).  Under 11 U.S.C. § 1109(b), any party in interest in a Chapter 11 case may raise and may appear and be heard on any issue in the case.  Section 1103(c) gives a creditors' committee broad powers to consult with the trustee or debtor in possession regarding case administration, to investigate the debtor's business and conduct, to participate in plan formation, and to take other appropriate actions with respect to the case.  Moreover, the Bankruptcy Code clearly contemplates that creditors may sometimes take legal action on behalf of the estate, subject to the Bankruptcy Court's approval. See 11 U.S.C. § 503(b)(3)(B) (allowing for recovery as an administrative expense a creditor's costs in recovering for the estate property transferred or concealed by the debtor, assuming the Bankruptcy Court has approved the creditor's actions).  If a debtor in possession in bad faith refused to bring an action that would obviously benefit the estate, a creditors' committee could bring the action itself, although there may be some question as to whether it would need the Bankruptcy Court's authorization to do so.  See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.), 330 F.3d 548, 566-67 (3d Cir. 2003).

    Thus, Congress clearly envisioned a system where a

creditors' committee may cooperate with the trustee or debtor in possession on behalf of the estate, or may even bring suit itself when such suit is consistent with the purposes of the Bankruptcy Code.  Where, as here, the debtors have asserted an objection, and the creditors' committee undertakes, with the agreement of the debtor in possession and the Examiner, to prosecute that objection, there is no reason not to apply the tax law that would apply were the debtor in possession bringing the action.

### 2.    The Evidence Presented

The only evidence that appears to have been presented with respect to the validity of the $610,135 net operating loss Management originally reported for tax year 2002 was Management's tax returns.  The debtors nowhere suggest that Rogers or the Examiner was able to testify to the validity of the deductions or the lack of income claimed on the original 2002 return.[12] Rather, the debtors argue, based on the playing-field-leveling intent behind 26 U.S.C. § 7491, that presentation of that tax return should be sufficient, because the IRS never told them which particular items it wished to challenge.  See Appellee's

---

[12] The Court need not determine whether the Bankruptcy Court properly admitted as expert testimony the statements of Rogers and the Examiner regarding matters as to which they lacked personal knowledge.  It is worth noting, however, that the Federal Rules of Civil Procedure apply in bankruptcy proceedings, Fed. R. Bankr. P. 7026, and that neither Rogers nor the Examiner submitted expert reports on these matters (unless the Bankruptcy Court was treating the Examiner's Report as such a report), see Fed. R. Civ. P. 26(a)(2).

Br. at 16-20.  They also suggest that the plain meaning of the
verb "to substantiate" "connotes behavior or conduct <u>responsive</u>
to [some specific] challenge or inquiry." <u>Id.</u> at 18.[13]  Finally,
they suggest that given the voluntary nature of the federal tax
system, the substantiation requirement should be interpreted to
arise "only in response to a specific challenge or inquiry by the
IRS as to that particular claim." <u>Id.</u>

The IRS first argues that the tax return, standing alone, is
not enough to substantiate the claimed net operating loss.
Appellant's Br. at 29-30.  It then argues that regardless of
whether the IRS informs the taxpayer of the specific items
challenged before hearing, the taxpayer must at least provide
some evidence regarding the major items at issue -- that is, the
income or lack thereof and the major deductions.  <u>Id.</u> at 32-34.

A corporation's tax return typically constitutes admissible
evidence to substantiate that a taxpayer is entitled to claim the
deductions listed therein, or that the taxpayer reported its
income and other items accurately.  The Federal Rules of Evidence
apply in bankruptcy cases, Fed. R. Bankr. P. 9017, and, upon a
proper foundation, corporate tax returns fall within the business

---

[13] Specifically, the debtors cite dictionary definitions:
"prov[ing] the truth of," or "giv[ing] good grounds for."
Appellee's Br. at 18 (quoting <u>The Oxford Encyclopedic Dictionary</u>
1344 (1991) (internal quotation marks omitted).  Although these
definitions suggest that one does not "substantiate" for no
reason, advancing a claim seems as likely a reason as defending
one.

records exception to the hearsay rule, Fed. R. Evid. 803(6).  The IRS argues that they are only admissible "to show what was represented to the IRS," <u>see</u> Appellant's Br. at 29 n.46, but this constitutes a misunderstanding of the hearsay rule.  A tax return is a statement regarding financial matters that have consequences for tax liability.  Naturally, authentic tax returns would be admissible on the issue of what was represented to the IRS, because in those circumstances the returns would not be "offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Here, it does not appear that the IRS objected to admission of Management's tax returns or sought to limit the scope of matters for which they could be admitted.  Any objection has therefore been waived, Fed. R. Evid. 103, and the tax returns as admitted have full probative force.  Thus, the corporate tax returns tend to prove that the financial "events" described therein actually happened.

Just because the debtors introduced some evidence, however, does not mean that they have provided "credible evidence." "Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted."  H.R. Conf. Rep. No. 105-599, at 240-41.  Cases that predate the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685, indicate that mere

introduction of tax returns, without more, is insufficient to prove a taxpayer's right to a refund.  The United States Tax Court, for example, when faced with a taxpayer who sought to substantiate certain deductions by submitting his tax returns, held that he had "presented no evidence to show that the [Commissioner of Internal Revenue] erred." Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979).  Moreover, it is a "familiar rule that an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer," INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992) (quoting Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943)) (internal quotation marks omitted).  Congress has not indicated that Section 7491 modifies this rule insofar as it relates to the minimum quality of evidence that a taxpayer must introduce to prevail.

If Congress had wished to make offer of relevant tax returns -- or testimony that the relevant tax returns are accurate -- sufficient to meet the "credible evidence" requirement, presumably that intent would have manifested itself in the language of the statute or in the legislative history, given that tax returns and testimony as to their validity would likely appear in virtually every case under Section 7491.  There is no such indication in either place, however.  Thus, to meet the

"credible evidence" standard, a taxpayer must present other evidence, such as business records, building deeds, testimony by customers or business partners, and so on.

The debtors argue that a taxpayer has no duty to substantiate any item related to that taxpayer's tax liability "unless and until the IRS or its agents makes an actual request or requests pursuant to 26 U.S.C. § 7491(a)(2)(B) for access to witnesses, information, or documents during an examination or litigation concerning the taxpayer's tax liability, or otherwise makes an actual determination or an assessment of tax liability against that taxpayer." Appellee's Br. at 16-17. This misreads the statute, which makes substantiation of liability-related items and compliance with reasonable requests for information separate requirements. Although it is true that Congress intended for Section 7491 to level the playing field, a taxpayer who is at sea as to what the IRS is challenging has a simple remedy available: he can ask.

Both the debtors and the Bankruptcy Court maintain that the IRS had an affirmative duty, much like a plaintiff in a civil case, to make its claims with some specificity before the opposing party is required to prove anything. It is not entirely clear who should play the role of the ordinary civil action plaintiff in this case, however. It is the debtors who sought, under 26 U.S.C. § 6411, a refund of moneys already paid to the

42

IRS.  Yet under 26 U.S.C. § 6411, barring some facial error, the IRS must automatically remit the requested refund, and then must affirmatively seek to undo the refund, which it did in this case by filing an administrative claim.  The debtors, however, are the ones who filed the objection to that claim, and the evidentiary hearing was scheduled to determine whether that objection should be sustained.  Which of these actions to resolve liability is "the" action?  The IRS ascribes some significance to the fact that, had it rejected Management's request for a refund, Management could only have obtained the refund through a tax refund suit under 11 U.S.C. § 505(a)(2), an adversary proceeding where the IRS would be the defendant.  See Fed. R. Bankr. P. 7001(1).  It may be, however, that part of the purpose of making the carryback refund virtually automatic was to place on the IRS the same burden of defining its claims that the law places on civil action plaintiffs.

The burden of proof provisions of Section 7491 provide little further guidance on this question.  The burden rests initially with the taxpayer, just as it would with a plaintiff. Yet, "[i]f after evidence from both sides, the court believes that the evidence is equally balanced, the court shall find that the secretary has not sustained his burden of proof."  H.R. Conf. Rep. No. 105-599, at 240-41 (1998).  A "tie" goes to the taxpayer, just as it would go to a defendant in an ordinary civil

43

case.

It is not necessary to determine the most appropriate analogy, however. Section 7491 does not suggest any affirmative obligation on the part of the IRS to define issues before trial, and courts need not read such an obligation into the statute. Similarly, the IRS does not have a duty to perform an examination or make an assessment before a taxpayer can be required to provide "credible evidence" that she is entitled to a refund. The Internal Revenue Service Restructuring and Reform Act of 1998 itself contemplated that judicial proceedings might occur without an examination. See Pub. L. No. 105-206, § 3001(c), 112 Stat. at 727 (establishing the effective date of Section 7491 both for cases that involve examinations and cases that do not). A taxpayer can always request, however, that the IRS specify which items it finds troubling and why, or can ask that the IRS agree not to challenge particular items, and the Bankruptcy Court has the power to ensure that each party fairly informs the other of what is at issue. See, e.g., Fed. R. Civ. P. 12(e), 33, 36, 37.

Here, rather than compiling an affirmative case to justify the refund, the debtors chose to place primary reliance on their argument that the burden of proof rested with the IRS. This theory proved incorrect, and the debtors must live with their tactical choice. In light of the Bankruptcy Court's finding that Management did indeed cost ICE over $600,000 in uncollectible

accounts receivable, it may well be that a case based on the contents of the debtors' books would also have proved unsuccessful, with substantially greater legal costs to boot, but the Court obviously has no occasion to express any opinion on such matters. A perusal of Management's pre-2002 returns strongly suggests that there were irregularities at least with regard to the major deductions: compensation of management and depreciation. It might well have been a fool's errand for the debtors to try to justify them without shifting the burden of poof.

Moreover, in this case, it would not have been difficult for the debtors to provide "credible evidence" to substantiate the items on Management's tax return. The alleged net operating loss is based on lack of income and on five deductions: compensation of officers; taxes and licenses; interest; depreciation; and "other deductions" (most of which consisted of the $450,000 management fee reversal). Appellant's App. at 337. Regarding lack of income, management fees were Management's sole source of income, so testimony of a single witness might have sufficed to provide "credible evidence" on that issue. Evidence of officer compensation in prior years might have substantiated a deduction in that category. Taxes, licenses, and interest were all minor items, but would not be difficult to substantiate, if the debtors had wished to do so. As for depreciation, some evidence showing

45

which items were depreciated, and that Management in fact owned them, might have sufficed. Finally, with regard to "other deductions," the debtors clearly knew this item was at issue, since the entire evidentiary hearing centered around the $450,000 reversal.

As a final matter, the Court notes that the debtors encounter something of a catch-22 here. To invoke the burden shifting framework of Section 7491, they must have "maintained all records required under this title." If the debtors have "maintained" such records, they should be able to access such records and present them as evidence in court. Their failure to do so, then, either tends to show that they have not complied with Section 7491(a)(2)(B), or raises an inference that such evidence, if provided, would be unfavorable to the debtors. See O'Dwyer v. Commissioner, 266 F.2d 575, 584 (4th Cir. 1959); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946).

To summarize, the debtors were required to present "credible evidence" as to each item that contributed to the net operating loss. The $450,000 reversal was invalid, and the debtors failed to present "credible evidence" of Management's claimed deductions and lack of income. Because the debtors have failed to meet their burden, Management is not entitled to a refund, and the decision of the Bankruptcy Court upholding the debtors' objection

46

to the IRS's administrative claim must be reversed.  The IRS's
administrative claim is allowed to the full extent of the
tentative refund it awarded to Management, despite the fact that,
as originally filed, the amount was indeterminate, because the
debtors have failed to provide credible evidence to substantiate
any item in the original or amended 2002 return, and the
Bankruptcy Court has closed the record.

Although this resolves all the issues in the case, for the
sake of completeness and judicial economy, the Court briefly
addresses the remaining arguments.

### E.    Evidence of Ineligibility for the Refund

The IRS makes several arguments about the questionable
nature of certain items on Management's tax returns.  See
Appellant's Br. at 34-40.  These arguments are quite persuasive,
but the Court does not address them at present, given the
adequate alternative grounds for decision.

### F.    Maintenance of Required Records and Compliance with Reasonable Requests for Information

The IRS argues that the debtors never should have been
eligible for Section 7491's burden-shifting framework in the
first place, because they failed to prove that Management
maintained required records, and because they failed to comply
with reasonable requests for information.  Here, the Bankruptcy
Court ruled correctly.  The debtors were not required to bring
all of their business records for the relevant five-year period

to the hearing.  Although the bankruptcy judge did not explicitly address records maintenance requirements, the testimony of the Examiner indicates that he consulted Management's business records, and the Bankruptcy Court could reasonably have inferred that those records were adequate to meet the requirement, particularly because the IRS presented no evidence to the contrary.  Similarly, the IRS made its requests for particular documents after the deadline for discovery, apparently due to its own lack of diligence in investigating the relevant issues.  Because the discovery schedule itself was reasonable, and the tardy request came only two days before the evidentiary hearing, the bankruptcy judge obviously did not consider the IRS's request "reasonable," and this Court agrees.

### G.   Closing Thoughts

The Bankruptcy Court was understandably frustrated with the IRS's litigation conduct -- particularly with the failure to file the required joint pre-trial memorandum.  The Bankruptcy Court stated at the November 19, 2003 evidentiary hearing that "had somebody asked earlier, I may have considered defaulting the government; but since nobody asked then and hasn't asked now, I'm not going to do it."  Appellant's App. at 243 (transcript of 11/19/03 hearing).  Indeed, had the Bankruptcy Court sanctioned the IRS, particularly short of actually defaulting, that might well have been within the bounds of its discretion.  The

Bankruptcy Court did not sanction the IRS, however, and to the extent that the debtors preserved at the evidentiary hearing any right to seek default or some other sanction, they have waived that right on appeal.  What remains, then, is the substantive law governing bankruptcy and federal income tax, and that law placed on the debtors a burden that they failed to meet.

## III.  CONCLUSION

Accordingly, the decision of the Bankruptcy Court is REVERSED.  The Bankruptcy Court shall allow the IRS's administrative claim, in the full amount of $347,345.56.  This case is hereby REMANDED for proceedings consistent with this opinion.

/s/ William G. Young

WILLIAM G. YOUNG
CHIEF JUDGE